**TRUSTEES OF the PROPERTY OF PENN CENTRAL TRANSPORTATION COMPANY, Petitioners,**

v.

**CONSOLIDATED RAIL CORPORATION, Respondent.**

Civ. A. No. 76-2.

Special Court, Regional Rail Reorganization Act.

May 14, 1976.

Charles A. Horsky, Washington, D. C. (Brice M. Clagett, and Covington & Burling, Washington, D. C., of counsel), for petitioners.

John G. Harkins, Jr., Philadelphia, Pa. (Alexander Kerr, Laurence Z. Shiekman, and Pepper, Hamilton & Scheetz, Philadelphia, Pa., of counsel), for respondent.

John H. Broadley, Dept. of Justice, Washington, D. C., for intervenor, United States of America.

Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

FRIENDLY, Presiding Judge:

On April 19, 1976, we heard argument on a motion by the Penn Central Trustees (the Trustees) for an order directing ConRail to

deposit with an appropriate escrow agent all proceeds which it received from the National Railroad Passenger Corporation (Amtrak) and, in case such proceeds were received in the form of credits or offsets against amounts payable by ConRail to Amtrak, amounts equivalent to such credits or offsets, in connection with ConRail's sale to Amtrak, pursuant to §§ 206(c)(1)(C) and 601(d) of the Rail Act, of the properties described as the Northeast Corridor (NEC or the Corridor).[1] Although the motion does not spell out the terms of the escrow in detail, the intent is to preserve the escrowed funds so that we may direct the escrow agent to pay them into court if we should find that they ought to be paid to Penn Central or eight other railroads leased or controlled by it owning properties in the Corridor which ConRail has transferred to Amtrak.

We noted at argument that although the motion was entitled as if made in an action captioned as above, no pleadings had been filed. However, since it was clear that the ultimate objective of the Penn Central Trustees was to have this court direct that the funds here sought to be escrowed should be turned over to the former owners of the Corridor properties transferred to Amtrak, we agreed, in the interest of expedition and with the consent of the parties, to entertain the motion; we directed the Penn Central Trustees to file a petition or complaint in due course[2] which ConRail is to answer.

## I.

Section 206(c)(1) of the Rail Act as originally enacted, 87 Stat. 995 (1974), provided that the Final System Plan (FSP) should designate which properties of railroads in reorganization in the region or of railroads leased, operated, or controlled by any railroad in reorganization in the region

(C) shall be purchased, leased, or otherwise acquired from the Corporation by the National Railroad Passenger Corporation in accordance with the exercise of its option under section 601(d) of this Act for improvement to achieve the goal set forth in subsection (a)(3) of this section.

Section 601(d)(1) provided:

(d) Northeast Corridor.—(1) Rail properties designated in accordance with section 206(c)(1)(C) of this Act shall be leased or may (at its option) be purchased or otherwise acquired by the National Railroad Passenger Corporation. The Corporation shall negotiate an appropriate sale or lease agreement with the National Railroad Passenger Corporation as provided in the final system plan.

In accordance with the Rail Act the FSP listed the NEC properties "designated for transfer to ConRail" and then "designated to be purchased, leased or otherwise acquired by Amtrak," pp. 323–26, see also pp. 39–43. The FSP also noted, p. 225, that it was an "unresolved question" how far we might "require ConRail to pass through the amounts it receives from Amtrak to the rail estates from which it obtains properties."

In Title VII of the Railroad Revitalization and Regulatory Reform Act of 1976, labelled "Northeast Corridor Project Implementation," Congress specified its plans for the NEC in considerable detail. Section 701(b) delineated the relationship between ConRail and Amtrak as follows:

(b) *Transfer of Rail Properties.*—The Corporation, on the date of conveyance pursuant to section 303(b)(1) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 743), shall, by purchase or lease, transfer to the National Railroad Passenger Corporation all rail properties designated pursuant to sections 206(c)(1)(C) and 601(d) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 716(c)(1)(C) and 791(d)), and it shall, within 180 days after the date of

---

1. Certain other properties adjacent to the NEC, designated under § 206(c)(1)(D), have also been made part of the same transaction. See also the supplementary designations contained in

the notice published at 41 Fed.Reg. 8846, 8850 (1976), pursuant to § 208(d)(3).

2. Such a petition was filed by the Penn Central Trustees on May 5, 1976.

enactment of this title, execute agreements providing for the National Railroad Passenger Corporation to assume (1) all operational responsibility for intercity rail passenger services with respect to such properties, and (2) control and maintenance of the properties transferred. Such parties may agree to retaining or transferring, in whole or in part, operational responsibility for rail freight or commuter rail services in the area specified.

Given these more complicated requirements as to the relationship of the two Corporations, § 601(d)(1) of the Rail Act was amended to read:

(d) *Northeast Corridor.*—(1) Rail properties designated in accordance with section 206(c)(1)(C) of this Act shall be purchased or leased by the National Railroad Passenger Corporation. The Corporation shall negotiate an appropriate sale or lease agreement with the National Railroad Passenger Corporation for the properties designated for transfer pursuant to section 206(c)(1)(C) of this Act (45 U.S.C. 716(c)(1)(C)), which shall take effect on the date of conveyance of such properties to the Corporation.

Extensive negotiations took place between Amtrak and ConRail with a view to Amtrak's purchasing the Corridor while assuring ConRail's rights to use the properties for services, primarily freight and commuter passenger services, that Amtrak did not propose to conduct. The negotiations culminated in nine agreements, all to be effective as of 12:01 a. m. on April 1, 1976, the hour and date of the conveyances from the transferors to ConRail.[3] The parties had agreed on a purchase price equal to the amount at which USRA had valued the properties being transferred; the agreement ultimately set this figure at $86,377,-616.[4] Originally it had been contemplated that Amtrak would pay in cash. When Congress declined to appropriate the funds needed for such a payment,[5] the parties

3. The general nature of these agreements is indicated by their titles—Agreement of Purchase (Amtrak—Purchased Northeast Corridor Properties); Agreement of Purchase (Amtrak—Purchased Off-Corridor Properties); Agreement to Lease (Amtrak—Leased Off-Corridor Properties); Northeast Corridor Management Agreement; Northeast Corridor Freight Operating Agreement; Northeast Corridor Commuter Operating Agreement; Maintenance of Freight Equipment Service Agreement; Maintenance of Commuter Equipment Service Agreement; and Off-Corridor Operating Agreement.

4. See § 206(d)(5).
 The agreement also provided for an adjustment in the price in case we should enter an order reallocating the initial compensation (but which does not result in the entry of a deficiency judgment against Seller) payable by Seller to the Transferors in connection with the conveyance of rail properties under the Act and such order results in an increase or decrease in the amount of compensation paid or payable by Seller to the Transferors for the rail properties conveyed by Seller to Purchaser . . . . .

5. See Conference Report No. 94–941, 94th Cong., 2d Sess., 6 (March 22, 1976). After reciting that the conference had deleted an appropriation of $85,182,956 to Amtrak inserted by the Senate, the report went on to say:

The issue of lease or purchase of the Northeast Corridor is to be resolved by the parties involved. However, in the event an agreement is reached pursuant to which Amtrak will purchase the Northeast Corridor properties, the conferees do not intend that either ConRail or Amtrak should be required to pay any funds or properties to the present owners of the Northeast Corridor rail properties for acquisition of such properties.

Senator Pastore, one of the Senate Managers, informed that body as follows, 122 Cong.Rec.S. 4331 (daily ed. March 25, 1976):

Mr. President, the Senate version of this resolution contained $85.2 million which would have allowed Amtrak to purchase the Northeast Corridor mainline from ConRail on April 1. We felt very strongly that Amtrak should have ownership of the track over which it had primary operating responsibility and where they will have control over the improvement program. The House conferees were adamant in their feeling that this bill should not contain that "unbudgeted" amendment since it would cause the resolution to be some $100 million over the budget. After long hours of debate over this amendment in conference, it became clear that the only way to complete it was to delete the funding for this purchase but to include language in the report making it clear that the parties involved, ConRail and Amtrak, still have the option of working out either a purchase or a lease of this track. I understand

agreed that it should be made in eight equal annual installments, commencing October 1, 1976, with interest at a rate provided in the agreement and with the obligation for the purchase price and the interest to be secured by a mortgage. The agreement of purchase went on to provide that ConRail should pay Amtrak for "Freight Costs," to wit, its fair and equitable share of Amtrak's costs in providing services as set forth in a Northeast Corridor Freight Operating Agreement simultaneously made. Subject to an exception not necessary to detail, the agreement of purchase provided that:

> each such payment which otherwise would be due and payable from Seller to Purchaser for such Freight Costs shall be retained by Seller and credited each month by Seller first against accrued interest, second, against any principal due but unpaid, third, against the next annual installment of principal and fourth, at Seller's option, against the next maturing installment(s) of the principal but not more than one-fourth (¼) of the Purchase Price in the case of the third and fourth items in the aggregate in any one annual period commencing October 1, and any

excess after such credit shall be promptly paid by Seller to Purchaser ("Order of Credit").

## II.

The Trustees' primary contention on their motion to escrow funds is that we have, in effect, already decided the ultimate issue in this action in their favor. They rely almost exclusively on a portion of Judge McGowan's opinion for this Court in *In re Penn Central Transportation Company*, 384 F.Supp. 895, 978–81 (1974).

We there dealt with a contention of the secondary debtors of Penn Central that the Rail Act was unfair in that owners of properties within the NEC were "subject to a forced transfer of their properties to Conrail solely to allow Conrail to re-sell or lease the same properties" to Amtrak, whereas owners "whose properties are destined for other profitable purchasers" would ultimately receive the compensation paid into Court by those purchasers. Discussing this, Judge McGowan noted clear indications in the legislative history that one reason for Congress' having interposed ConRail between the NEC transferors and Amtrak

they are about to complete negotiations on a purchase over time, which requires no appropriations at this time, but will cause Amtrak to incur future increased costs which must be funded. However, should a reprogramming of fiscal 1976 Amtrak appropriations be necessary to fulfill a purchase agreement, the committee has no objection to such action. Senator Magnuson, also a manager and Chairman of the Senate Commerce Committee, added, *id.* at S. 4332:

> Furthermore, the conferees recognized that Amtrak and ConRail are executing an agreement that will provide for the transfer of title to the Northeast Corridor on conveyance date in exchange for an adjustment in the moneys that ConRail would otherwise owe to Amtrak as a result of ConRail's need for trackage rights over the corridor properties for freight operations. This is an arrangement that the conferees view with favor, and feel that it provides a good middle ground between the need for Amtrak to own the properties as of conveyance date and the administration's desire not to fund any substantial improvements in rail passenger service. While I would have personally favored an appropriation of the full amount to purchase these properties right now, I feel that

the essential goal of Amtrak owning the properties it will be operating and improving in conjunction with the Federal Railroad Administration can be fulfilled adequately under this arrangement.

> The conferees recognized that the parties—ConRail and Amtrak—were negotiating a purchase agreement for the corridor properties, and recognize that this agreement contemplates an adjustment in the trackage rights compensation ConRail would owe Amtrak for freight operations on the corridor in exchange for conveyance of title to the properties, in accordance with the requirements of title VII of the Railroad Revitalization and Regulatory Reform Act of 1976. This matter was discussed at length by the conferees, and it was agreed that this agreement should be negotiated by the parties— ConRail and Amtrak. Any use of Amtrak funds that have been appropriated for the purpose is dependent on the agreement negotiated, and the conferees agree that a reprogramming of Amtrak capital funds may be necessary. The so-called anti-deficiency statute (31 U.S.C. 665) would not apply to any such reprogramming.

The remarks of Senator Bayh, also a conferee, are to much the same effect. *Id.*

was to "provide ConRail with badly needed cash," and then said:

> We wish to emphasize that we do not consider this a sufficient justification for the asserted discrepancy in treatment, nor do we consider the process of the Act "fair and equitable" insofar as the discrepancy rests solely on this justification. Conrail's need for cash does not in itself demonstrate why the cash should be raised uniquely out of the pockets of the NEC owners.

However, this statement must not be read out of context. Judge McGowan proceeded to show that the discrepancy in treatment need not rest "solely on this justification" but might also be based on others, notably the probable need for negotiating complex arrangements with Amtrak for joint use. He went on to say that even if USRA or ConRail were to "use the authority to take and reconvey NEC properties purely to raise cash *and without any such justification as we have described being applicable*" (emphasis supplied), the Act would still not be unfair, for this Court would have power, in its review of the final system plan, to direct ConRail to issue a special form of "security" to the NEC transferors or to enter a judgment "in favor of the NEC owners and against Conrail in the amount of the proceeds of such resale." 384 F.Supp. at 981.

 It seems to us that far from committing this Court to giving the Trustees the relief they ultimately seek, Judge McGowan's opinion points in the opposite direction. Events have vindicated his prediction that the interposition of ConRail was, at least in part, for the important purpose of furthering the complex negotiations between ConRail and Amtrak, although it obviously does result in ConRail's getting, or saving, cash which ConRail would otherwise not have gotten or saved. Moreover, Judge McGowan did not say that even if we were eventually to conclude that the interposition of ConRail was solely to "provide ConRail with badly needed case" —a conclusion for which, as presently advised, we perceive no basis—we would be bound to require ConRail to pass through, as a separate fund, the consideration received from Amtrak. He spoke only of the exercise of our powers under § 303(c) to reallocate securities, or if necessary to enter a judgment, in order to cure whatever unfairness might exist.[6] In this regard the amended Rail Act affords the NEC owners much greater protection than they had when our 1974 opinion was written. Certificates of value, constituting general obligations of the United States, are now an important part of the compensation transferors are to receive. Beyond that, § 303(c)(5) gives the NEC transferors (and some others) a protection not accorded to transferors generally. This is that if this Court should hold that amounts payable to them in ConRail securities and certificates of value do not suffice, for one reason or another, and that a judgment for an additional amount should be entered against ConRail, the United States will pay it. As the legislative history indicates, this provision was enacted in part to cover precisely the type of judgment Judge McGowan had suggested might be necessary. Sen.Rep. 94–499, 94th Cong., 1st Sess. 94–95 (1975).

In thus holding that our previous statement is a long way from insuring the Trustees an ultimate victory, we do not mean to suggest that their claims are necessarily without merit. The transferors of NEC properties may still argue that depriving them of any payment in cash or even postponing such payment is unconstitutional or

---

**6.** Even if the transfer of the NEC is viewed as an exercise of the power of eminent domain, a point on which we express no opinion, it is still true, as pointed out in our opinion in *Norwich & Worcester R. R. Co. v. United States*, 408 F.Supp. 1398, 1405 (1976), that the Constitution does not compel contemporaneous payment of compensation for properties taken in the exercise of eminent domain so long as the applicable statute "recognizes the absolute right of the owner, upon his property being taken, to just or reasonable compensation therefor, and makes provision . . . for the ascertainment . . . of the compensation to which, under the constitution, he is entitled," quoting *Sweet v. Rechel*, 159 U.S. 380, 404, 16 S.Ct. 43, 50, 40 L.Ed. 188, 197 (1895).

unfair and inequitable in a situation where ConRail has already received cash (or is receiving an equivalent) from a sale of their properties,[7] at least when other transferors of properties for which cash compensation was deposited in Court pursuant to § 303(a)(2) obtain more favorable treatment. We would expect that ConRail not only would dispute the Trustees' general position but would assert countervailing considerations, including such factors as that the moneys being withheld from Amtrak as offsets against the purchase price of the Corridor properties are in effect being supplied by the United States so long as Amtrak operates at a deficit, see note 5 *supra*, and that a Conference Committee reported to Congress its intention that such moneys should not be paid to the transferors, *id.* While the Trustees properly maintain that we would not be bound by such an assertion of Congressional purpose if the Constitution or the Rail Act requires otherwise, the statement is entitled to weight if our ultimate decision is in part a discretionary one.

### III.

ConRail has argued that the Trustees' motion for an escrow is analogous to a request for an interlocutory injunction, a view in which we concur. The controlling standards for the issuance of such an injunction in a case like this, where the public interest is deeply implicated, were classically stated in *Virginia Petroleum Jobbers Ass'n v. F. P. C.*, 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958). The court there set forth a four-factor test: probability of success on the merits; irreparable injury to the proponent; harm to other interested parties; and the public interest. See also 7 Moore, Federal Practice ¶ 65.04[1] (1976).

■ Aside from saying that the Trustees do not have a clear-cut road to ultimate victory, we prefer not to make a prediction on the probability of their success on the merits, since, as indicated, these have not yet been fully briefed for us. There is no need to do so, since the Trustees have conspicuously failed to meet the second of the *Virginia Petroleum* criteria, namely, a showing that without interlocutory relief they will be irreparably injured. There is no reason why this litigation cannot proceed promptly. Most of the facts are already before us. If further facts are needed, they can doubtless be stipulated, and we are ready to entertain proposals for a prompt briefing schedule. The first payment by Amtrak is not due until October 1, 1976, and while offsets will occur before then, these can be readily cancelled if we should hold the Trustees to be entitled to the ultimate relief sought. Whatever differences of opinion may exist with respect to the viability of ConRail, no one suggests that it will run out of funds in 1976, and the Trustees have made no showing of need for relief before we can render a final judgment. We realize that the four criteria of *Virginia Petroleum* are to be considered together rather than separately. But, apart from the fact that plaintiffs' showing on the first criterion is not overwhelming, the balance on the third and fourth criteria tilts in ConRail's favor.

The Trustees have argued that the relief they seek is really in the nature of a prejudgment attachment, and that their request for an escrow should be determined by the less stringent standard allegedly applicable. Nothing in the Rail Act remotely suggests an intention of Congress to subject the property of ConRail to attachment to meet transferors' claims to compensation; indeed any such construction would frustrate the entire scheme of the statute. In any case, we fail to see how categorizing the motion in this fashion would lead to any different result. The Trustees do not contend that they have actually complied or could comply with any state statutory at-

---

**7.** The Trustees have not contended and, in light of *Berman v. Parker*, 348 U.S. 26, 33–36, 75 S.Ct. 98, 102–104, 99 L.Ed. 27, 37–39 (1954), could not successfully contend, that exercise of eminent domain in favor of ConRail (if that is what it is) with immediate reconveyance to Amtrak is *per se* unconstitutional.

tachment procedure or that one is applicable; the suggestion rather appears to be that we should fashion appropriate equitable relief on analogy to these state processes. Even if we were authorized so to act, a question of great difficulty, see 7 Moore, Federal Practice ¶ 64.04[3] at 64–19 to 64–21 (1976), we still would encounter the facts that the purpose of the attachment process (aside from its use for asserting jurisdiction) is merely to provide security and that the Trustees have failed to show they are in any way insecure.

Thus, while it may be that the attachment analogy would reduce the showing of probable success on the merits required of the Trustees, see, e. g., *Stines v. Hertz Corp.*, 22 A.D.2d 823, 254 N.Y.S.2d 903 (2 Dept. 1964), *aff'd*, 16 N.Y.2d 605, 261 N.Y. S.2d 59, 209 N.E.2d 105 (1965), it would still require a showing that ConRail would be unable to respond to a future order concerning the fund which the Trustees propose to have created and put into escrow. See *Deckert v. Independent Shares Corp.*, 311 U.S. 282, 290, 61 S.Ct. 229, 234, 85 L.Ed. 189, 195 (1940). Indeed, we do not understand the Trustees to argue that the law is otherwise; they merely contend that "ConRail, in agreeing to accept the purchase price in the form of credits or offsets against payments due from it to Amtrak, has already guaranteed that the fund will be dissipated." That contention is based on a formalistic notion of a "fund" having no relation to the realities of this case.

The motion of the Penn Central Trustees for an order directing an escrow is denied.