UNITED TRANSPORTATION
UNION, Petitioner,

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY,
New Jersey Transit Rail Operations,
Inc., Respondents,

and

Consolidated Rail Corporation, Rule
19 Party,

and

United Transportation Union, General
Committee of Adjustment, Conrail
North; and Suzanne E. Woodard, et al.,
Intervenors.

No. 82-25.

Special Court
Regional Rail Reorganization Act.

Feb. 9, 1983.

Joseph P. Altier, Altier Wayne & Klein, New York City, for United Transp. Union.

Alan J. Davis and Mark L. Alderman, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Southeastern Pennsylvania Transp. Authority.

Kenneth S. Levy, Deputy Atty. Gen., Irwin I. Kimmelman, Atty. Gen. of the State of N.J., Newark, N.J., for New Jersey Transit Rail Operations, Inc.

David S. Fortney and Dennis Alan Arouca, Consol. Rail Corp., Philadelphia, Pa., and Harry A. Rissetto and John A. Fraser, III, Morgan, Lewis & Bockius, Washington, D.C., for Consol. Rail Corp.

Norton N. Newborn, Gaines & Stern, Cleveland, Ohio, for United Transp. Union, Gen. Committee of Adjustment, Conrail North.

Paul Schachter, Paul Schachter, P.A., Newark, N.J., for Suzanne E. Woodard, et al.

Before GASCH, Presiding Judge, and BRYANT and WEINER, Judges.

## MEMORANDUM OPINION

WEINER, Judge:

This action was brought by representatives of the United Transportation Union (UTU) on a petition for review of the separate awards of two arbitrators made pursuant to § 508 of the Rail Passenger Service Act (RPSA) as amended by § 1145 of the Northeast Rail Service Act of 1981 (NRSA), Pub.L. No. 97–35 (August 13, 1981), 95 Stat. 357, 669. 45 U.S.C. § 588. In Count I the petitioners challenge the seniority provisions of the October 10, 1982 award and implementing agreement of Dr. Francis X. Quinn resulting from an arbitration proceeding among UTU, Southeastern Pennsylvania Transportation Authority (SEPTA) and Consolidated Rail Corporation (Conrail). Count II of the petition challenges the differing seniority provisions of the October 14, 1982 award and implementing agreement of Mr. Richard R. Kasher resulting from an arbitration proceeding among UTU, New Jersey Transit Rail Operations, Inc. (NJT), and Conrail. Certain other aspects of the awards of these two neutral referees have been challenged in two previous cases before this Court. We dismissed a petition for review of Referee Kasher's award on other grounds in *New Jersey Transit Rail Operations, Inc. v. International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; et al.,* 550 F.Supp. 1327 (Sp.Ct.R.R.R.A. 1982) (*NJT v. IBB*). A petition to review other provisions of Dr. Quinn's award was dismissed in *American Railway & Airway Supervisors Association v. SEPTA and Conrail,* 551 F.Supp. 688 (Sp.Ct.R.R.R.A.1982) (*ARASA v. SEPTA*).

This case was initiated when a petition for review was filed on November 12, 1982. Fearing that the pendency of this action would adversely affect a scheduled December 22, 1982, awarding of NJT positions to Conrail train service employees, Conrail, on December 7, 1982, moved for an expedited determination of paragraph 18(a) of the petition. After an order to show cause was issued and no objection was received, the Court ordered that the merits of paragraph 18(a) of the petition for review be determined on an expedited schedule and set oral argument for December 17, 1982. On December 10, 1982, petitioner filed a "cross" motion for a preliminary injunction to require New Jersey Transit Rail Operations, Inc. (NJT) to utilize without any alteration the Conrail seniority district G roster in awarding all NJT positions. On the same date the United Transportation Union, General Committee of Adjustment, Conrail North (intervenor UTU) moved to intervene as a party-respondent alleging that its members opposed the relief sought by petitioner UTU. At oral argument on December 17, 1982, no objection to the intervention of intervenor UTU was made and leave to intervene was granted from the bench.

We received a motion to intervene by twenty individual minority and female Conrail employees only minutes prior to convening the oral argument. At the argument, the Court announced that the individual employees' motion to intervene would be taken under advisement and would be decided after the parties had an opportunity to file papers in opposition to the motion. In response NJT filed its opposition and Conrail filed an opposition which it supplemented twice.

On December 21, 1982, one day before the scheduled awarding of positions with NJT, we denied petitioner's motion for a preliminary injunction. The standards for the issuance of a preliminary injunction found in *Trustees of the Property of the Penn Central Transportation Company v. Consolidated Rail Corporation,* 421 F.Supp. 1055, 1060 (Sp.Ct.R.R.R.A.1976), were applied and it was determined that the public interest would be ill-served through the issuance of a preliminary injunction. We further found that petitioner failed to demonstrate a likelihood of success on the merits. Based upon the reasons stated herein, the Court rules that paragraph 18(a) of the petition should be dismissed.

## BACKGROUND

This action was brought in the name of the UTU at the initiative of UTU General Committee of Adjustment, Conrail (PLE–T), one of approximately seventeen constituent UTU general committees representing Conrail employees and one of two general committees directly affected by the arbitration award of Mr. Kasher. UTU is a labor organization representing operating employees in the railroad industry. UTU represents both train service and engine service employees, although the dispute in this case involves only train service employees, i.e. conductors and trainmen. The employees represented by petitioner UTU are present Conrail employees who work on the rail lines formerly operated by the Penn Central Railroad. The majority of petitioner's members were formerly employed by Penn Central prior to April 1, 1976. Petitioner UTU represents 38.3% of Conrail train service employees affected by Mr. Kasher's award. Intervenor UTU represents present Conrail employees working on rail lines formerly operated by Erie Lackawanna Railway and Central Railroad of New Jersey (CNJ). Most of these employees were employed by the EL and CNJ prior to April 1, 1976. Intervenor represents the remaining 61.7% of Conrail train service employees affected by the Kasher award.

A complete discussion of the legal and factual background of the arbitration proceeding before Referee Kasher is contained in Judge Gasch's opinion in *NJT v. IBB.* In that prior case UTU was served with the verified petition of NJT but failed to enter an appearance. The identity of and relationship between NJT and Conrail were also described in that case. 550 F.Supp. at 1328.[1] Familiarity with that opinion is assumed and we will augment the factual and legal discussion in *NJT v. IBB* only where necessary for clarity in this case.

During the arbitration proceedings before Referee Kasher, petitioner UTU was represented by its General Chairman, C.P. Jones, and intervenor UTU was represented by its General Chairman, L.W. Swert. Both General Chairmen made initial and reply submissions to Referee Kasher and participated in the arbitration proceeding. Being dissatisfied with Referee Kasher's award regarding the preservation of prior seniority rights, petitioner UTU requested a clarification of portions of the award. Subsequent to a conference held on December 3, 1982, Mr. Kasher issued a clarification of his award and implementing agreements by telegram on December 6, 1982 (Exhibit D to the affidavit of C.P. Jones).

Paragraph 18(a) of its petition alleges that provisions of the Kasher award and implementing agreement among UTU, NJT and Conrail are beyond the scope of a neutral referee's jurisdiction under § 508 in that by establishing a company wide seniority roster the award does not preserve "prior" seniority rights to the extent possible as required by that section.[2]

---

1. The record of the arbitration proceedings before Referee Kasher was delivered to the Court on October 21, 1982, by the National Mediation Board and filed in *NJT v. IBB,* Civil Action No. 82–23. The Court, in discussing the instant case, will refer to the submissions of the parties to the arbitration proceeding as found in that record.

2. The text of paragraph 18(a) is as follows:

18. The seniority provisions of the Kasher Award and Implementing Agreement are be-

The concept of prior seniority rights is a familiar one in the railroad industry. Under the existing Conrail seniority system, an employee may have seniority based on both his date of hire and the particular predecessor railroad employing him prior to the formation of Conrail on April 1, 1976. Seniority rights based on employment with Conrail's predecessor railroad are known as prior rights. An individual employee may also have "prior prior" rights if he was employed by a railroad which was absorbed or merged into one of Conrail's predecessor railroads. An example of the exercise of prior and prior prior seniority rights exists where a former Erie employee with twenty-five years seniority has greater seniority on a rail line formerly operated by the Erie railroad than a former employee of the Pennsylvania Railroad with thirty years seniority. Likewise, a former Lackawanna employee with twenty years seniority by exercising his prior prior rights would have greater seniority on a former Lackawanna line than the employee with twenty-five years on a rail line formerly operated by the Erie Railroad.

In the proceedings before Referee Kasher, both petitioner and intervenor UTU agreed to the establishment of an "order selection list" utilizing prior and prior prior seniority rights.[3] Petitioner recognizes that the Kasher award provides for the application of prior and prior prior rights of Conrail employees within Conrail's seniority district G for that purpose. The procedures for establishing the order selection list are found in Article X., paragraphs A to C, of Referee Kasher's implementing agreement which is reproduced in the margin.[4] Under

yond the scope of the neutral referee's jurisdiction under Section 508 of RPSA in that they:

(a) Created a Limited Order Selection List of UTU employees only for the initial purpose of going over to NJT. Once over, all prior seniority rights end and, contrary to Section 510, establishes a new type seniority system (dove tailed company-wide seniority). The Kasher award changes the seniority from job run to company run seniority, drastically changing and affecting the seniority of all transferring personnel in contradiction to the intent of NERSA. The award specifically directs that seniority prior rights will not be applicable after January 1, 1983.

. . . specifically prohibited and contraindicated by the Congress in Section 508(c)(5) and (7) of the RPSA, which subsections indicate that implementing agreements should protect prior seniority "to the extent possible" (5), and should insure the protection of prior seniority rights (7).

**3.** In its October 1 submission to Referee Kasher petitioner UTU proposed an implementing agreement. Article IV.A. of that agreement is as follows:

IV. SENIORITY

A. There will be a single NJTRO Seniority District for train service employees effective January 1, 1983 and the standing of employees on the NJTRO seniority roster shall be in accordance with the Order Selection List provided for in Paragraph I. The Order Selection List will be the only standard of seniority on NJTRO for Conrail employees and, except for the standing on the Order Selection List, prior rights will not be applicable after January 1, 1983.

The wording of Article IV of Referee Kasher's implementing agreement is almost identical to the wording submitted by petitioner UTU.

**4.** X. TRAIN SERVICE ORDER SELECTION LIST

The following procedures will be instituted to establish the Order Selection List and NJTRO's Seniority Roster provided for in Article II.B. and shall govern the transfer of train service employees to NJTRO in accordance with Section 508 of the Rail Passenger Service Act, as amended by the Northeast Rail Service Act of 1981 (Section 1145).

A. The number of train service employees by prior prior right seniority district that were employed in the service operated for NJTRO, including assignments supporting such service as of August 1, 1982 are:

244.1—Erie Lackawanna
230.4—Penn Central
127.0—Central Railroad of N.J.

B. On the basis of the above figures, the percentage allocations to be used in placing employees on the Order Selection List are:

40.58%—Erie Lackawanna
38.30%—Penn Central
21.12%—Central Railroad of N.J.

and the specific Order Selection List is as indicated in Section E of this Article X.

C. Employees will be placed on the Order Selection List on the basis of their prior prior or prior right seniority. In the event there are insufficient applications from employees with prior prior rights to fill the allocated numbers for any of the Penn Central prior prior right districts, the remaining employees below the last prior prior right employee of that district will be drawn from prior right Penn Central

Referee Kasher's implementing agreement, after the order selection list was created utilizing prior seniority rights, a company wide seniority system was to be used to award NJT positions to Conrail employees. Under this new system an employee's seniority is based on his earliest retained seniority dates as a trainman with Conrail or a predecessor railroad.[5] This creation of a company seniority system, rather than one based on prior rights, was advocated by NJT and intervenor UTU [6] but was opposed by petitioner.

Referee Kasher's explanation of his decision to create a two step process to determine which employees are to be transferred to NJT and their relative seniority is found on page 14 of his arbitration opinion (Exhibit D to the Petition):

3. *Prior Rights*

The operating crafts organizations have sought full implementation of the concept of prior rights on NJTRO. Section 508(c)(5) speaks in terms of preserving employees' prior seniority rights on NJTRO, "to the extent possible." On the other hand, Section 508(c)(7) provides that these same employees shall have their prior rights on Conrail ensured.

In our Opinion the statute does not mandate retention of full prior rights on the commuter authority. "To the extent possible" requires, in our Opinion, recognition of the prior rights principle, while, at the same time, establishing a seniority system that NJTRO, as a new carrier, can administer properly and fairly.

Accordingly, we have used the concept of prior rights to determine initial bidding entitlements and identified the number of assignments attached to the prior right seniority districts for order selection list purposes. However, once the order selection lists have been established, NJTRO employees will have their seniority rights determined on the basis of their last date of hire, without a break in service, with Conrail or a predecessor carrier. The Awards ensure all prior and prior prior rights on Conrail.

From the discussion of prior rights in his opinion, it is apparent that Referee Kasher considered the question of preserving prior rights. His award provides for application of prior and prior prior rights for the purpose of determining which employees are to be transferred to NJT and for the utilization of date of hire to determine the relative seniority of those employees for bidding on positions with NJT. Referee Kasher's December 6th decision on petitioner

---

employees and placed on the Order Selection List on the basis of their prior right Penn Central roster standing. Vacancies remaining on the Order Selection List, following the exercise of prior prior and prior rights, will be filled with applicants from the District "G" train service roster on the basis of their Conrail seniority.

5. The provision in Referee Kasher's implementing agreement is Article X.D. which states:

Once train service employees have been placed on the Order Selection List in accordance with the foregoing principles, the standing of such employees for the purpose of bidding assignments with NJTRO shall be determined on the basis of their earliest retained seniority dates as trainmen with Conrail or a Conrail predecessor railroad. Such employees' prior prior or prior rights on Conrail are not disturbed by this Award.

6. In a proposed agreement submitted to Referee Kasher on October 1, 1982, by L.W. Swert, intervenor UTU proposed that "date of hire" seniority be the method for determining senior-

ity on NJT. Paragraph 10 of that proposed implementing agreement states:

There will be a single Seniority Roster for Trainmen on NJTA effective January 1, 1983. This Trainmens Seniority Roster will encompass the entire area of NJTA operations. The NJTA Seniority Date for Trainmen transferring to NJTA and for Trainmen bidding for NJTA jobs and not awarded a position, the total of such employees not to exceed the number on the NJTA Seniority Roster established pursuant to paragraph 3, shall be the date of earliest retained seniority a Trainmen with Conrail or a Conrail predecessor railroad. The NJTA Seniority Date will be the only standard of seniority in awarding NJTA jobs after December 31, 1982. "Prior prior right" or "prior right" seniority will not be applicable on NJTA after December 31, 1982. No trainman however, will be required to exercise his seniority at a distance of more than 30 miles from his home or then current work site as a condition of maintaining his NJTA seniority unless otherwise provided in an applicable NJTA collective bargaining agreement.

UTU's request for clarification reaffirmed his intention to utilize this two step process.

In accordance with the mandate of § 1136 of NRSA, Conrail ceased operation of commuter service on January 1, 1983. On that date NJT began its operation with train service employees awarded positions in accordance with Referee Kasher's implementing agreement.

## DISCUSSION

### A. Jurisdiction And Standard Of Review

■ As we have stated several times in previous cases,[7] the Court has original and exclusive jurisdiction over actions seeking an interpretation of § 508 of RPSA pursuant to the jurisdiction found in § 1152(a) of NRSA. This Court has held that judicial review of a neutral referee's award under § 508 is extremely limited and that petitioner must meet a heavy burden before it can succeed in having a referee's award set aside. *NJT v. IBB,* 550 F.Supp. at 1329. Section 508(d)(3) provides that such an award is to be "final and binding to the same extent as an award of an adjustment board under § 3 of the Railway Labor Act". Judicial review under that section is limited to consideration of whether the arbitrator failed to comply with the statute's requirements, failed to act within his jurisdiction, or acted corruptly. *Id. See Union Pacific Railroad Company v. Sheehan,* 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354, reh. den., 439 U.S. 1135, 99 S.Ct. 1060, 59 L.Ed.2d 98 (1978); *Air Line Pilots Association v. Eastern Air Lines, Inc.,* 632 F.2d 1321, 1323 (5th Cir.1980); *Brotherhood of Railroad Trainmen v. Central of Georgia Railway Company,* 415 F.2d 403, 415 (5th Cir.1969).

### B. Arguments of Petitioner UTU

In support of its motion for a preliminary injunction, petitioner UTU argues that the Kasher award is illegal and contradicts the clear language of § 508(c)(5) and § 508(c)(7). Further, petitioner argues that the referee exceeded his jurisdiction by usurping the proper functions of the collective bargaining process contrary to the provisions of § 510 of RPSA. Petitioner additionally asserts that the implementation of Referee Kasher's award would irreparably harm Conrail minority employees and would result in racial and sexual discrimination.

### 1. Failure To Comply With Statute

■ Petitioner contends that the Kasher award contradicts the clear language of § 508 which calls for the protection of prior rights. It is assumed that petitioner is arguing that Referee Kasher did not act in compliance with the statute's requirements. Section 508(c)(5) provides that an implementing agreement shall "determine the procedure for determining seniority of such employees in the respective crafts or classes . . . which shall, to the extent possible, preserve their prior seniority rights". Petitioner claims that Referee Kasher was bound to fully preserve all prior and prior prior seniority rights without any modification. This claim does not comport with the clear language of § 508(c)(5) which contemplates some alteration in the seniority system when Conrail employees are transferred to a commuter authority. Indeed, petitioner, in its submission to the neutral referee, recognized that certain modifications

**7.** *See Railway Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority* (SEPTA I), 534 F.Supp. 832 (1982), cert. denied, —— U.S. ——, 102 S.Ct. 2271, 73 L.Ed.2d 1285 (1982); *Railway Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority* (SEPTA II), 534 F.Supp. 852 (1982); *International Brotherhood of Teamsters v. Southeastern Pennsylvania Transportation Authority* (SEPTA III), 539 F.Supp. 1222 (1982); *Railway Labor Executives' Association v. Southeastern Pennsylva-* nia *Transportation Authority* (SEPTA IV), 547 F.Supp. 884 (1982) cert. denied, —— U.S. ——, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *New Jersey Transit Rail Operations, Inc. v. International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers,* 550 F.Supp. 1327 (1982); *American Railway & Airway Supervisors Association v. Southeastern Pennsylvania Transportation Authority,* 551 F.Supp. 688 (1982); *United Transportation Union v. Metro-North,* 554 F.Supp. 429 (1983).

to Conrail's seniority system would be necessary. Petitioner proposed that the award should create a single seniority district for NJT and that, except for standing on the order selection list, prior rights would not apply after January 1, 1983. Referee Kasher accepted this suggestion, *see* footnote 3. Now for the first time petitioner asserts that Referee Kasher, in order to comply with the statute, must reject its submission, and the submission of all other parties to the arbitration, and apply the seniority provisions of Conrail's collective bargaining agreements and the Conrail seniority district G roster in awarding positions with NJT. Such an assertion is without foundation.

While it appears that it would have been within the power of a neutral referee to require a commuter authority to recognize and apply, without any modification, the Conrail system of prior seniority rights, it is not the only plausible interpretation of § 508(c)(5). The words "to the extent possible" in § 508(c)(5) clearly contemplate that preservation of prior seniority rights is to be balanced against other considerations. The concern of Congress in requiring the balancing of possibly conflicting considerations can be found in the statement of the Congressional conferees on § 508:

> The implementing agreement provided for in a new section 508 of the Rail Passenger Service Act is designed to provide for an orderly transfer of employees from Conrail to Amtrak Commuter or the commuter authorities. The conferees note their intent to provide for maximum flexibility to the employees and employers involved by providing generally for retention of seniority rights.

Explanatory Statement, 127 Cong.Rec. S9062 (daily ed. July 31, 1981). It is clear that Congress anticipated that certain changes in the applicability of prior seniority rights might be necessary to achieve flexibility in employee assignments. We find that Congress granted the neutral ref-

eree the discretion to determine the level of protection to be accorded to prior seniority rights. All parties to the arbitration proceeding, including petitioner, considered the establishment of a single seniority district for NJT necessary to obtain such flexibility. Referee Kasher acted in the context of an arbitration proceeding in which the commuter authority and intervenor UTU, the labor organization representing the majority of employees to be transferred, proposed the establishment of a company wide seniority roster based on date of hire. We find that Referee Kasher acted within the limits of his discretion in rejecting petitioner's position. It is clear that in exercising his discretion Referee Kasher complied with the statute's requirements in determining the procedure for the preservation of prior seniority rights.

Petitioner also contends that § 508(c)(7) requires that the implementing agreement ensure the retention of prior seniority rights. Section 508(c)(7) is specific in its terms which provide that the implementing agreement will "ensure the retention of prior seniority rights *on Conrail* of employees transferred to a ... commuter authority ..." (emphasis added). Section 508(c)(7) by its very terms does not apply to seniority rights in the employment of a commuter authority and Referee Kasher's award in no way affected the rights of employees on Conrail.[8] Indeed Referee Kasher's award expressly provides for the retention and continued accumulation of freight seniority rights by those employees transferred to NJT. *See* Article X.D. of Referee Kasher's implementing agreement. Petitioner's reliance on § 508(c)(7), therefore, is groundless.

### 2. Failure to Act Within Arbitrator's Jurisdiction

 Petitioner contends that Referee Kasher exceeded his jurisdiction under § 508 by infringing upon a subject more properly resolved within the § 510 collec-

---

**8.** For a more complete discussion of § 508(c)(7) *see* *UTU v. Metro-North,* 554

F.Supp. 429 (Sp.Ct.R.R.R.A.1983).

tive bargaining process. The specific contention is that Referee Kasher by establishing a date of hire seniority system went beyond the scope of his § 508 authority and encroached upon a subject solely within the scope of the § 510 negotiations. Although the creation of a seniority system for NJT employees is a proper subject of a collective bargaining agreement reached through the § 510 process, the claim that Referee Kasher necessarily encroached on the § 510 process by establishing seniority procedures is not persuasive. As we established in *ARASA v. SEPTA:* "[T]he implementing agreement must be reached before new collective bargaining agreements are fully negotiated. Under these circumstances, it would be very difficult for an implementing agreement to totally avoid addressing some issues that are later subject to change during bargaining under section 510." 551 F.Supp. at 691. NJT and both petitioner and intervenor UTU acting together must reach a collective bargaining agreement pursuant to § 510 and such an agreement may modify the seniority provisions of a § 508 implementing agreement. We find that Referee Kasher addressed the prior seniority rights issue as required by § 508(c)(5) and did not impermissibly infringe on the collective bargaining process of § 510. Rather a charge could be made that Referee Kasher failed to act within his jurisdiction if he failed to "determine the procedure for determining the seniority of such employees ...." Therefore, petitioner's claim that the seniority provisions of Referee Kasher's award and implementing agreement were beyond his jurisdiction is rejected.

### 3. Civil Rights Claim

Petitioner UTU's final contention in its motion for a preliminary injunction is that the implementation of Referee Kasher's award will result in *de facto* discrimination against Conrail employees who are black, Hispanic, or women. Petitioner bases this assertion on general allegations that minority and female employees of Conrail have fewer years of seniority than white male employees. Petitioner does not attempt, however, to explain how application of Conrail's present seniority system would protect minority or female employees to any greater extent than the seniority provisions of Referee Kasher's award.

During the process of transferring commuter rail service from Conrail to the commuter authorities a large number of Conrail employees are being offered a smaller number of positions with the commuter authorities. Certain employees will be able to choose among positions with Conrail, Amtrak, NJT, or SEPTA.[9] Others with less seniority will be limited to the positions not desired by more senior employees. Petitioner does not offer any evidence or make any argument on how use of Conrail's seniority district G roster would prevent minority employees hired after a particular date from having less seniority than those Conrail employees hired before the same date. Nor does petitioner show how the full application of prior rights in awarding NJT positions would protect minority or female employees from being displaced by more senior employees. Date of hire seniority is a traditional mechanism for the assignment and allocation of jobs. Referee Kasher's award utilizes a system of seniority which removes a traditional restriction on an employee's ability to bid for jobs imposed by application of prior and prior prior rights. Some minority and female employees may be harmed by this system while others may benefit. Petitioner has not offered any proof that the establishment of a company wide date of hire seniority system for NJT will have a disparate impact on minorities or women. Therefore, petitioner's claim that Referee Kasher's award is discriminatory is without merit.

### C. Claims of Minority and Female Intervenors

### 1. Motion to Intervene

The Court now addresses the motion to intervene of individual minority and female

---

**9.** *See* affidavit of Robert O'Neill, accompanying Conrail's memorandum in opposition to petitioner's motion for a preliminary injunction.

employees of Conrail. The movants are twenty black, Hispanic, and female employees of Conrail and members of the UTU. In their motion they claim that they will be unemployed as a result of implementation of the seniority provisions of Referee Kasher's award. Movants seek an injunction to restrain NJT from altering the Conrail seniority district G roster of passenger conductors and trainmen. Movants also assert that petitioner does not adequately represent their position as minority and female employees. In their proposed complaint, they allege that the Kasher award is in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000–e, *et seq.*, 42 U.S.C. § 1981, 42 U.S.C. § 1983, the Fifth and Thirteenth Amendments to the Constitution, and Executive Order 11246. Both NJT and Conrail have opposed the motion to intervene on the grounds that it was not timely. Indeed, movants seek to bar an act which was scheduled to take place on December 22, 1982, through proposed intervention six days before that date and thirty-four days after the filing of the petition. Movants seek to press their claim in this matter beyond the eleventh hour. In spite of their untimely application, an order granting the motion to intervene was entered on January 21, 1983.

### 2. Motion for Preliminary Injunction

We must now decide whether the minority intervenors have established an adequate factual or legal basis for enjoining Referee Kasher's award. The minority intervenors claim that Referee Kasher's award is illegal because it results in the disparate treatment of minorities and women. They argue that from this disparate treatment the Court can discover discriminatory intent which is required in cases involving a bona fide seniority system. *See, Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *American Tobacco Co. v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). We hold, that on the facts as presented, disparate treatment of minority and female Conrail employees as a result of Referee Kasher's award has not been shown. On December 22, 1982, Conrail filed a supplemental response to the motion to intervene, attached to which, as Exhibit A, was the NJT seniority roster as of that date. That seniority roster contained the names of each successful bidder for a position with NJT. The names of ten of the minority intervenors appear on that roster. On December 23, 1982, Conrail filed an addendum to its supplemental response to the motion to intervene to which was attached the affidavit of Vincent F. Cronan, Assistant Director—Labor Relations for Conrail. In that affidavit Mr. Cronan states that Conrail employment records show that seventeen of the twenty minority intervenors bid for positions with NJT under the terms of the Kasher award. Of those seventeen employees who bid for NJT positions four were not awarded a position with NJT. Each of those four employees was first employed by Conrail subsequent to April 1, 1976 and would not have been able to exercise prior seniority rights under the Conrail collective bargaining agreement since they had no prior seniority rights with respect to a Conrail predecessor railroad.[10] The Court fails to see how the applicability or nonapplicability of prior seniority rights would affect the employment rights of the four unsuccessful minority intervenors. The full preservation and appli-

---

10. *See* affidavit of Suzanne E. Woodard, accompanying motion to intervene. The four employees and their dates of hire are:

Suzanne E. Woodard October 7, 1977
Carol B. Williams June 1, 1977
Susan Greene June 1, 1977
Tyrone C. McRae October 13, 1977

According to the Cronan affidavit, three other intervenors employed in NJT service did not bid for a position with NJT. These employees and their dates of service are:

Angel Soto March 10, 1978

Philip Warren July 28, 1976
Ed F. Barnes November 8, 1972

The only intervenor with prior seniority not awarded a position with either NJT or Amtrak was Ed F. Barnes. The supplemental affidavit of Woodard states by information and belief that Mr. Barnes bid for an NJT position. Mr. Cronan, in ¶ E of his affidavit states that Conrail's records show that Mr. Barnes bid for a position with Amtrak and SEPTA but not with NJT.

cation of prior seniority rights would not benefit minority employees who do not possess such prior rights. Intervenors seem to misapprehend the meaning of prior seniority rights in the railroad industry. It is not disputed that the minority intervenors may have been adversely affected by the ability of senior Conrail employees to bid for positions that minority employees held prior to the transfer of commuter rail service to the commuter authorities. This adverse effect would occur, however, whether Referee Kasher's award completely preserved prior rights or not. Accordingly, we find no disparate treatment of non-whites or women resulting from the date of hire seniority system found in Referee Kasher's award and, therefore, deny the minority intervenors' motion for a preliminary injunction.

### 3. Motion for a Stay

The minority intervenors have also moved to stay this Court's order of December 21, 1982, denying petitioner UTU's motion for a preliminary injunction. In support of their motion to stay, intervenors argue that because Referee Kasher's award created a new seniority system that new system could not be a bona fide seniority system and, therefore, discriminatory intent need not be proven. We do not address this argument as intervenors have not shown disparate treatment resulting from the Kasher award. To support their factual presentation, intervenors offer a supplemental affidavit of Suzanne E. Woodard. This affidavit states that two white female intervenors were awarded positions with NJT while black female intervenors senior to the white intervenors were not successful bidders. The affidavit also states that one Hispanic and three black men were not awarded positions with NJT despite the fact that they were more senior to some persons awarded positions with NJT. Only one of the intervenors mentioned in Woodard's supplemental affidavit possessed prior seniority rights which may have been affected by Referee Kasher's award. Re-

garding that intervenor, however, it has not been established, or even alleged, that he was, or would have been, displaced by an employee with greater Conrail seniority but lesser prior right seniority on Penn Central.[11] None of the intervenors have demonstrated a loss of employment rights due to the establishment of a date of hire seniority system for NJT by Referee Kasher's award.

Insofar as the motion asks the Court to enjoin NJT from implementing the seniority provisions of the Kasher award, intervenors seek substantially more than a mere stay of our order denying petitioner's motion for a preliminary injunction. Minority intervenors seek to obtain the preliminary injunction which this Court declined to issue. For the same reasons intervenors' motion for a preliminary injunction was denied, the motion for a stay is also denied.

## CONCLUSION

For the reasons stated herein, paragraph 18(a) of the petition must be dismissed. We hold that Referee Kasher acted both in accordance with § 508 and within his jurisdiction when he established procedures for determining NJT seniority for Conrail employees based on the employees date of hire with Conrail or a predecessor railroad. The minority intervenors have failed to establish any disparate treatment of nonwhite or female employees resulting from the Kasher award. Therefore, their motion for a preliminary injunction and motion for a stay of our December 21, 1982 order denying petitioner's motion for a preliminary injunction are denied. This memorandum opinion constitutes our findings of fact and conclusions of law.

---

**11.** Whether that intervenor, Ed F. Barnes, bid for a position with NJT has been disputed by

Conrail in the Cronan affidavit. *See* footnote 10.