NEW JERSEY TRANSIT RAIL OPERA-
TIONS, INC., Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF
BOILERMAKERS, IRON SHIP BUILD-
ERS, BLACKSMITHS, FORGERS AND
HELPERS; et al., Respondents.

No. 82–23.

Special Court,
Regional Rail Reorganization Act.

Nov. 5, 1982.

Julian C. D'Esposito, David M. Spector, Robert G. Fitzgibbons, Jr., Isham Lincoln & Beale, Chicago, Ill., and Irwin I. Kimmelman, Atty. Gen., Kenneth S. Levy, Deputy Atty. Gen., State of N.J., Newark, N.J., for petitioner New Jersey Transit Rail Operations, Inc.

James L. Highsaw, William G. Mahoney, Clinton J. Miller, III, John J. Sullivan, Highsaw & Mahoney, P.C., Washington, D.C., for respondents Non-Operating Craft Unions.

Harold A. Ross, Cleveland, Ohio, and Peter Winslow, Washington, D.C., for respondent Brotherhood of Locomotive Engineers.

Dennis Alan Arouca, David S. Fortney, Philadelphia, Pa., and Harry A. Rissetto, John A. Fraser, Morgan, Lewis & Bockius, Washington, D.C., for respondent Consolidated Rail Corp.

Before GASCH, Presiding Judge, and BRYANT and WEINER, Judges.

## MEMORANDUM

GASCH, Presiding Judge:

This case is before the Court on the petition of New Jersey Transit Rail Operations, Inc. (NJT) for review of an arbitrator's award. Petitioner seeks reversal of an October 14, 1982 award made by Neutral Referee Richard R. Kasher pursuant to Section 508 of the Rail Passenger Service Act (RPSA) as amended by the Northeast Rail Service Act of 1981 (NRSA), Pub.L. No. 97–35 (August 13, 1981), 45 U.S.C. § 588. This Court heard oral argument on NJT's motion for a preliminary injunction on October 21, 1982. Subsequently, we granted petitioner's request for additional argument on the motion and consolidated that argument with an argument on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, on October 28. On November 1, we issued an order denying the motion for a preliminary injunction and stated that our decision on the merits would follow. This memorandum constitutes our findings of fact and conclusions of law. For the reasons stated herein, the petition is dismissed.

## I. BACKGROUND

This Court has exclusive original jurisdiction of this action under Section 1152(a)(1) of NRSA. Petitioner is a subsidiary of New Jersey Transit Corporation, which is a public corporation chartered pursuant to the laws of the state of New Jersey to provide commuter services in that state. NJT is a "commuter authority" as defined in Section 1135(a)(3) of NRSA and was organized for the purpose of assuming Consolidated Rail Corporation's (Conrail) commuter rail operations in New Jersey.

In the past, Conrail has provided commuter service to the area under a subsidy arrangement with New Jersey as provided by Section 304 of the Regional Rail Reorganization Act of 1973. Pursuant to Section 1136 of NRSA, Conrail's commuter obligations will cease on January 1, 1983. NJT is now in the process of attempting to effect the successful transfer of operations from Conrail. The unions that are involved in this litigation are railroad labor organizations representing certain crafts and classes of operating and non-operating employees currently employed by Conrail in New Jersey. Each of these organizations has members that are subject to possible transfer to NJT on January 1, 1983.

NRSA amended the RPSA in order to provide for the orderly transfer of employees during the complex process under which Conrail is to be relieved of all legal obligations to operate commuter lines. Sections 508 through 510 prescribe the methods under which Conrail employees are to be absorbed by Conrail's successors to the extent determined by the collective bargaining process. This Court has previously addressed these sections in another context in several other cases. See, *Railway Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority (SEPTA I)*, 534 F.Supp. 832, cert. denied, —— U.S. ——, 102 S.Ct. 2271, 73 L.Ed.2d 1285 (1982); *Railway Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority (SEPTA II)*, 534 F.Supp. 852 (1982); *International Brotherhood of Teamsters v. Southeastern Pennsylvania Transportation Authority (SEPTA III)*, 539 F.Supp. 1222 (1982); *Railway Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority (SEPTA IV)*, 547 F.Supp. 884 (1982). The interpretation of Sections 508 and 510 is directly at issue in this litigation. They are discussed in detail below.

Pursuant to Section 508(a), NJT, Conrail and the unions began negotiations in an attempt to negotiate a mutually satisfactory implementing agreement. By August 1, 1982, no such agreement had been reached. Section 508(d)(1) requires that, within five days, the parties select a neutral referee in the event that implementing agreement negotiations are not completed by August 1. Unfortunately, the parties were also unable to select an arbitrator by August 6. Accordingly, pursuant to Section 508(d), the National Mediation Board appointed Mr. Kasher on September 7, 1982 to resolve all implementing agreement disputes. Hear-

ings began on September 17 and Referee Kasher entered his Decision and Award on October 15, 1982. Kasher held that he did not have jurisdiction to consider NJT's proposed changes in crafts and classes of employees. In addition, he held that each offer of employment extended by NJT be advertised, bid, and awarded "in accordance with the provisions of the applicable Conrail collective bargaining agreement."

NJT vigorously contests the validity of this award. It has set forth two distinct challenges to Kasher's action. First, NJT challenges Kasher's decision that he lacked jurisdiction under Section 508(d) to consider NJT's proposed changes in crafts and classes of employees. In addition, petitioner claims that the referee exceeded his jurisdiction when he ordered that the advertising, bidding and awarding of all jobs on NJT's new service be made pursuant to the terms and provisions of existing Conrail collective bargaining agreements.

## II. DISCUSSION

### A. The Standard of Review

 It should be noted initially that NJT must meet a heavy burden of proof before it can succeed in having this Court set aside the referee's award. Section 508(d)(3) of NRSA states that such an award under Section 508 is to be "final and binding to the same extent as an award of an adjustment board under section 3 of the Railway Labor Act." Judicial review of arbitrators' determinations under that act is very limited. In *Union Pacific Railroad Company v. Sheehan,* 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354, *reh. den.* 439 U.S. 1135, 99 S.Ct. 1060, 59 L.Ed.2d 98 (1978), the Supreme Court held that in order to overturn such a decision there must be a showing either that the arbitrator failed to comply with the Act's requirements, failed to act within his jurisdiction, or acted corruptly. 439 U.S. at 93, 99 S.Ct. at 402. Petitioner has failed to show the existence of any of these circumstances.

### B. The Statutory Scheme

As discussed earlier, Congress enacted Sections 508, 509, and 510 to aid in the orderly transfer of commuter service from Conrail to the commuter authorities.[1] Section 509, which is not in issue in this case, provides for a factfinding panel to make recommendations on commuter operating practices and procedures by July 1, 1982. The first real step in the employee transfer process is covered by Section 508, which is appropriately entitled "Transfer of Employees." This section requires the parties to negotiate an implementing agreement. Section 508(c) mandates that such negotiations shall determine various employment requirements, such as the number of employees to be transferred, the specific employees to be transferred, the procedures by which such employees may elect to accept employment, the procedure for acceptance of such employees, and the procedure for determining seniority. In short, these agreements are to determine the Conrail employees that may be transferred to the successor commuter authority.

Section 510 is entitled "Collective Bargaining Agreement for Commuter Authorities." This section is unique in that it specifically provides for the dissolution of the existing Conrail collective bargaining agreements pertaining to commuter operations. Section 510(a)(1) requires that the commuter authorities and the unions enter into new collective bargaining agreements with respect to pay, rules, and working conditions after implementing agreements have been successfully negotiated under Section 508. This section also provides a detailed mechanism for aiding in the resolution of any disputes which may arise during these new collective bargaining procedures. A special Presidential emergency board is specifically provided in order to assist the parties, if necessary, to reach a final collective bargaining agreement.

### C. NJT's Arguments

NJT's first claim is that the neutral referee erred in determining that he did not

---

1. The complete text of Sections 508 and 510 is set forth in the Appendix to this memorandum.

have jurisdiction to consider any crafts or classes of employees other than those already recognized in existing Conrail collective bargaining agreements. In its presentation before Mr. Kasher, NJT urged him to take certain action not specifically mentioned in Section 508. NJT wishes to streamline Conrail's present job descriptions and procedures and thereby make its operations more efficient and less costly. Among other things, NJT seeks to change certain job descriptions and classifications and, as a result, decrease the total number of employees it will need.

Under existing collective bargaining agreements, shop employees are divided into six crafts and numerous subsidiary classes. Each of these crafts has been recognized in National Mediation Board determinations by scope provisions of Conrail collective bargaining agreements. During implementing agreement negotiations, NJT stated that it intended to devise a new classification system. NJT hopes to compress Conrail's present six job classifications for shop employees into four new classes entitled Inspector, Technician, General Repair Person and Utility Person. NJT proposed that the determinations required by Section 508(c)(1)–(5) relating to seniority rosters and numbers of employees transferred be based upon these new four classes rather than the historical craft and class distinctions.

Petitioner contends that in order to determine how many, and which, employees should be offered jobs as required by Section 508, they must make their offer unencumbered by Conrail's existing collective bargaining agreement. Because of the Congressionally mandated termination of existing Conrail collective bargaining agreements relating to commuter operations, NJT claims that there exists no continuing job positions that may serve as the subject matter of the Section 508 implementing agreement. In short, petitioner contends that Kasher could not fashion an implementing agreement without confronting the threshold question of the nature of the job offer which is to be the subject of the implementing agreement.

NJT's main argument behind both of its attacks on Kasher's award is that the purpose of the removal of Conrail's commuter obligation was to make the commuter railroads more efficient and less costly. It claims that if it is forced to mold its initial employment offer after existing collective bargaining agreements (which are allegedly a major cause of many of Conrail's problems), it will encounter the same operating losses which Conrail faced. Petitioner also claims that burdening it with these agreements will invite strikes and labor unrest because the agreements and job positions will eventually have to be changed.

The economic viability of the new commuter authorities may indeed have been one of Congress' concerns when it enacted NRSA. This Court has, however, already reviewed the legislative history of the statute in great detail in *SEPTA I.* In that case, we rejected a somewhat similar economic argument advanced by SEPTA. We noted that NRSA was part of the Omnibus Budget Reconciliation Act. The object of this act was clearly to save money for the federal government. The primary purpose of NRSA, as outlined in Sections 1132 and 1133, was to reduce federal subsidization. Termination of Conrail's involvement with commuter operations was deemed essential to that goal. *SEPTA I,* 534 F.Supp. at 841.

■ Because of the plain language of the statutory scheme set out in Sections 508 and 510, the Court concludes that it is not necessary to delve deeply into NRSA's legislative history. The main obstacle NJT faces is that such a variation of job classifications is traditionally accomplished through collective bargaining. Even NJT concedes that such matters are resolved through this process. Section 510(h) explicitly states that the provisions set forth in that section shall be the *exclusive* means for resolving any disputes relating to initial collective bargaining agreements. The Supreme Court has repeatedly emphasized that courts are bound to look initially to the plain language of the statute. *See, e.g., Browder v. United States,* 312 U.S. 335, 338,

61 S.Ct. 599, 601, 85 L.Ed. 862 (1941); *United States v. Kahn,* 415 U.S. 143, 151, 94 S.Ct. 977, 982, 39 L.Ed.2d 225 (1974). When, as here, the statute's meaning is clear on its face, it must be followed unless doing so would lead to an absurd result or unless the legislative history strongly indicates otherwise. *See, e.g., United States v. American Trucking Association,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *United States v. Key,* 397 U.S. 322, 324–25, 90 S.Ct. 1049, 1051, 25 L.Ed.2d 340 (1970); *United States v. Rutherford,* 442 U.S. 544, 552, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979).

Under NRSA, Congress has established what it considers to be a system for the orderly transfer of employees. Section 508 is fairly explicit in the elements that must be included in implementing agreements. Section 510 specifically provides that the new collective bargaining agreements are to be reached according to its standards. The arbitrator held that he did not have the jurisdiction to consider the proposed changes that NJT was attempting to impose. He held that the statute prevented him from considering any change *at this point.* In so doing, the Court concludes that he was following Congress' mandate. To allow the arbitrator to rule on proposed changes in job classifications would provide for a new method of making employment decisions not contemplated by the statute. In effect, the arbitrator would be making decisions which Congress provided should be made during collective bargaining. Moreover, Congress provided that, if necessary, the emergency boards were to be the mediators of any such disputes.

■ Sections 508 and 510 clearly delineate the matters which are to be resolved at each step of the transfer process. If Congress intended the Section 508 arbitrator to resolve matters that are historically subject to collective bargaining, it would have stated this in Section 508 and would not have established a detailed bargaining, factfinding, mediation and emergency board scheme in Sections 509 and 510. Thus, the Court concludes that under the statutory frame-

work enacted by Congress, a Section 508 arbitration proceeding is not the proper stage for a change in craft and class determinations. Current collective bargaining agreements must be relied upon until after the implementing agreement is finalized. As Conrail and the unions correctly point out, and as NJT reluctantly concedes, such changes may indeed occur later on in the process during the Section 510 proceedings.

■ NJT's second argument is much easier to dispose of. In many respects, the two arguments overlap. Petitioner contends that the referee exceeded his jurisdiction by requiring posting, bidding, and awarding of positions under Section 508 to be based on existing Conrail bargaining agreements. The same rates of pay, rules, and working conditions currently in effect must be used by NJT during the implementing agreement process.

The standard of review of an arbitrator's award under Section 508 has been discussed *supra.* Once again, we hold that NJT has not sustained its burden of proof. This Court may not substitute its judgment for that of the referee. It cannot be said that Kasher exceeded his jurisdiction simply because he rejected NJT's proposal and adopted the one advanced by the other parties to the arbitration.

We do not find anything in the statute that might be construed to forbid the referee's actions. NJT is correct when it claims that binding a new employer to the substantive terms of an old collective bargaining agreement will usually result in serious inequities. In this case, however, NJT is not bound by Conrail's old collective bargaining agreements. It has the opportunity of changing their terms when the time comes under Section 510. In addition, NJT apparently fails to comprehend that this is not a normal new employer-new employee relationship. NJT is actually taking over an already existing rail operation and any burdens which Kasher's award has imposed upon it may only be temporary.

Most of NJT's arguments are quite rationally based, but they are not in conformity with the statute's requirements. Refer-

ee Kasher's award is not in conflict with the process provided by NRSA's plain statutory language and will promote the orderly transfer of authority from one operating corporation to the other. Rather than complicating an already monumental task by attempting to decide difficult employment issues at this point, the Referee has devised a very logical way of moving Conrail employees over to NJT. After collective bargaining, some employees may not be needed and they may have to return to Conrail. However, the posting announcements have incorporated language similar to that suggested by the Court at the October 28 hearing. This will serve to warn applicants that subsequent bargaining efforts may result in substantial changes. Wherefore, for the reasons stated above, the petition is dismissed.

### APPENDIX

The full text of §§ 508 and 510 is as follows:

SEC. 508. TRANSFER OF EMPLOYEES.

(a) Not later than May 1, 1982, Conrail, commuter authorities that intend to operate commuter service, and representatives of the various crafts or classes of employees of Conrail to be transferred to the commuter authorities shall enter into negotiations for an implementing agreement in accordance with subsection (c) of this section.

(b) Not later than May 1, 1982, Conrail, Amtrak Commuter, and representatives of the various crafts or classes of employees of Conrail to be transferred to Amtrak Commuter shall enter into negotiations for an implementing agreement in accordance with subsection (c) of this section.

(c) Such negotiations shall—

(1) determine the number of employees to be transferred to Amtrak Commuter or a commuter authority;

(2) identify the specific employees of Conrail to whom Amtrak Commuter or a commuter authority offers employment;

(3) determine the procedure by which such employees may elect to accept employment with Amtrak Commuter or a commuter authority;

(4) determine the procedure for acceptance of such employees into employment with Amtrak Commuter or a commuter authority;

(5) determine the procedure for determining the seniority of such employees in their respective crafts or classes in Amtrak Commuter or with a commuter authority which shall, to the extent possible, preserve their prior seniority rights;

(6) ensure that all such employees are transferred to Amtrak Commuter or a commuter authority no later than January 1, 1983; and

(7) ensure the retention of prior seniority on Conrail of employees transferring to Amtrak Commuter or a commuter authority and determine the extent and manner in which such employees shall be permitted to exercise such seniority in order to (A) provide employees transferred to Amtrak Commuter or a commuter authority at least one opportunity every six-month period to exercise previous freight seniority rights, (B) maximize employment opportunities for employees on furlough, (C) maintain the ability to recall experienced employees, (D) ensure that under no circumstances are seniority rights exercised in any manner which results in any disruption of service or a position being filled which would otherwise not be filled under the terms of any crew consist, fireman manning, or other similar agreement, and (E) ensure that Conrail has the right to furlough one employee in the same craft or class for each employee who returns from Amtrak Commuter or a commuter authority by exercising seniority.

(d)(1) If agreements with respect to the matters being negotiated pursuant to this section are not reached by August 1, 1982, the parties to the negotiations shall, within an additional 5 days, select a neutral referee. If the parties are unable to agree upon the selection of such a referee, the National Mediation Board shall immediately appoint a referee.

(2) The referee shall commence hearings on the matters being negotiated pursuant to this section not later than 5 days after the date he is selected or appointed, and shall render a decision within 20 days after the date of commencement of such hearings. All parties may participate in the hearings, but the referee shall have the only vote.

(3) The referee shall resolve and decide all matters in dispute with respect to the negotiation of the implementing agreement or agreements. The referee's decision shall be final and binding to the same extent as an award of an adjustment board under section 3 of the Railway Labor Act, and shall constitute the implementing agreement or agreements between the parties. The National Mediation Board shall fix and pay the compensation of such referees.

(e) If Amtrak Commuter transfers commuter service and properties to a commuter authority under section 506 of this title, Amtrak Commuter, the commuter authority, and representatives of the various crafts or classes of employees to be transferred to the commuter authority shall enter into an implementing agreement in accordance with subsection (c) of this section. If no agreement is reached by the date service and properties are transferred, the dispute shall be resolved by a neutral referee in accordance with subsection (d) of this section.

(f) Any employee of Conrail who is not offered employment with Amtrak Commuter or a commuter authority under agreements entered into under this section shall be provided employee protection under section 701 of the Regional Rail Reorganization Act of 1973 to the same extent as if such employee had remained in the employ of Conrail.

SEC. 510. COLLECTIVE BARGAINING AGREEMENT FOR AMTRAK COMMUTER OR COMMUTER AUTHORITIES

(a)(1) Not later than September 1, 1982, the commuter authorities that intend to operate commuter service and the representatives of the various classes or crafts of employees to be transferred to such commuter authorities under agreements entered into under section 508 of this Act shall enter into new collective bargaining agreements with respect to rates of pay, rules, and working conditions.

(2) Not later than September 1, 1982, Amtrak Commuter and the representatives of the various classes or crafts of employees to be transferred to Amtrak Commuter under agreements entered into under section 508 of this Act shall enter into new collective bargaining agreements with respect to rates of pay, rules, and working conditions.

(b) If the parties have not reached an agreement by the date specified in subsection (a) of this section, any party to the dispute or the Governor of any State through which the service that is the subject of the dispute is operated may, within 15 days after such date, request the President to establish an emergency board pursuant to subsection (c) of this section.

(c) Within 15 days after the request under subsection (b) of this section, of a party or a Governor, the President shall create an emergency board. Such board shall conduct a public hearing on the dispute at which each party shall appear and provide testimony, and shall, within 30 days after the date of its creation, report on the dispute.

(d) If no settlement in the dispute is reached within 10 days after the report of the emergency board, such board shall require the parties to the dispute to submit, within 5 days, final offers to the board for settlement of the dispute.

(e) Within 15 days after the submission of final offers, the emergency board shall submit a report to the President setting forth its selection of the most reasonable offer.

(f) If the emergency board selects a final offer submitted by a carrier and the employees of such carrier engage in any work stoppage arising out of the dispute, such employees shall not be eligible during the period of such work stoppage for benefits under the Railroad Unemployment Insurance Act.

(g) If the emergency board selects a final offer submitted by the employees and the carrier refuses to accept such offer, the carrier shall not participate in any benefits of any agreement between carriers which is designed to provide benefits to such carriers during a work stoppage.

(h) The provisions set forth in this section shall be the exclusive means for resolving any dispute relating to entering into an initial collective bargaining agreement between Amtrak Commuter or a commuter authority, as the case may be, and representatives of the various classes or crafts of employees to be transferred to Amtrak Commuter or such commuter authority.