**BOSTON CELTICS LIMITED
PARTNERSHIP, Appellee,**

v.

**Brian SHAW, Defendant, Appellant.**

**No. 90–1621.**

United States Court of Appeals,
First Circuit.

Heard July 11, 1990.

Decided July 16, 1990.

Martin E. Silfen, with whom Silfen & Glasser, P.C., New York City, Laura L. Carroll, Robert L. Kirby, Jr., and Widett, Slater & Goldman, P.C., Boston, Mass., were on brief, for defendant, appellant.

Neil Jacobs, with whom Christopher J. Perry and Hale & Dorr, Boston, Mass., were on brief, for appellee.

Jeffrey A. Mishkin, Marc J. Goldstein, William S. Koenig, Proskauer Rose Goetz & Mendelsohn, Gary B. Bettman and Joel M. Litvin, New York City, were on brief, for National Basketball Ass'n, amicus curiae.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and SELYA, Circuit Judge.

BREYER, Chief Judge.

On January 23, 1990, Brian Shaw signed a contract with the owners of the Boston Celtics (the "Celtics") in which he promised that he would cancel his commitment to play for an Italian basketball team next year so that he could play for the Celtics instead. When Shaw threatened to break his agreement with the Celtics, they immediately sought arbitration. The arbitrator found that Shaw must keep his promise. The Players Association that represents Shaw agreed with the arbitrator. The Celtics then asked the federal district court to enforce the arbitrator's decision. The court ordered it enforced.

Shaw now appeals the district court's order. We have examined the arbitration award, the district court's determination, the briefs, and the record. We conclude that the district court's decision is lawful, and we affirm it.

## I

### Background

#### A. *Facts*

The basic facts, which are not in dispute, include the following:

(a) In 1988, soon after Shaw graduated from college, he signed a one-year contract to play for the Celtics.

(b) In 1989, Shaw signed a two-year contract to play with the Italian team Il Messaggero Roma ("Il Messaggero"). The team agreed to pay him $800,000 for the first year and $900,000 for the second year. The contract contains a clause permitting Shaw to cancel the second year (1990–91). It says that Shaw has

> the right to rescind the second year of this Agreement ... [if he] returns to the United States to play with the NBA ... by delivering a registered letter to [Il Messaggero] ... between June 20, 1990 and July 20, 1990.

(c) At the end of January 1990 Shaw signed a five-year "Uniform Player Contract" with the Celtics. The contract contains standard clauses negotiated by the National Basketball Association ("NBA") franchise owners and the National Basketball Players Association (the "Players Association"). It adopts by cross-reference arbitration provisions contained in the NBA–Players Association Collective Bargaining Agreement. In the contract, the Celtics promise Shaw a $450,000 signing bonus and more than $1 million per year in compensation. In return, Shaw promises the Celtics, among other things, that he will cancel his second year with Il Messaggero. The contract says that the

> Player [*i.e.,* Shaw] and Club [*i.e.,* the Celtics] acknowledge that Player is currently under contract with Il Messaggero Roma (the "Messaggero Contract") for the 1989–90 & 1990–91 playing seasons. The Player represents that in accordance with the terms of the Messaggero Contract, the Player has the right to rescind that contract prior to the 1990–91 season *and the player hereby agrees to exercise such right of rescission* in the manner and at the time called for by the Messaggero Contract.

(Emphasis added.)

(d) On June 6, 1990, Shaw told the Celtics that he had decided to play for Il Mes-

saggero during the 1990–91 season and that he would not exercise his right of rescission.

### B. *Procedural History*

On June 11, 1990, the Celtics invoked their right under the Collective Bargaining Agreement (cross-referenced in the Contract) to an "expedited" arbitration proceeding. The arbitrator held a two-day hearing on June 13 and 14. He found that Shaw's refusal to rescind the Il Messaggero contract violated Shaw's contract with the Celtics. He ordered Shaw to rescind the Il Messaggero contract (on June 20) and not to play for any team other than the Celtics during the term of his Celtics contract. On June 15, Shaw said he still did not intend to rescind the Il Messaggero contract.

The Celtics responded immediately by asking the federal district court to use its authority under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to enforce the award, *see General Drivers No. 89 v. Riss & Co.*, 372 U.S. 517, 519, 83 S.Ct. 789, 791, 9 L.Ed.2d 918 (1963) (per curiam); *Kemner v. District Council Of Painting and Allied Trades No. 36*, 768 F.2d 1115 (9th Cir.1985); *Kallen v. Dist. 1199, National Union of Hospital Employees*, 574 F.2d 723, 725 (2d Cir.1978) ("[F]ederal courts indisputably have jurisdiction under section 301 to enforce a labor arbitration award"), and the parties no longer dispute that § 301 applies. The Celtics asked the court for "expedited enforcement" of the award and for a preliminary injunction. After receiving Shaw's response (in the form of an opposition, a motion to dismiss, a brief, and supporting affidavits), and after holding an oral hearing, on June 26, the court granted the Celtics' motion to expedite, ordered Shaw to cancel the Il Messaggero agreement "forthwith," and "enforced" the award. Shaw now appeals this district court decision, attacking both the preliminary injunction and the order enforcing the arbitration award.

## II

### *The Legal Merits*

Shaw makes two basic categories of argument in his effort to show that the district court lacked the legal power to enter its order. First, he says that the arbitration award was itself unlawful. Second, he says that regardless of the lawfulness of the award, the district court followed improper procedures. We shall address these arguments in turn and explain why we find each not persuasive.

### A. *The Arbitrator's Decision*

Shaw says that the district court should not have enforced the arbitrator's award because that award was itself unlawful, for any of five separate reasons.

█ 1. *The termination promise.* Shaw argues that the arbitrator could not reasonably find that he broke a contractual promise to the Celtics because, he says, the Celtics had previously agreed with the Players Association that contracts with individual players such as Shaw would not contain promises of the sort here at issue, namely, a promise to cancel a contract to play with a different team. Shaw says that this previous agreement between the Celtics and the Players Association renders his promise to terminate Il Messaggero "null and void." To support this argument, he points to Article I, section 2 of the Collective Bargaining Agreement, which Shaw and the Celtics, through cross-reference, made part of their individual agreement. Section 2 says, "Any amendment to a Uniform Player Contract [of the type Shaw and the Celtics used], other than those permitted by this [Collective Bargaining] Agreement, shall be null and void." The Agreement permits amendments (a) "in ... respect to the compensation ... to be paid the player," (b) "in respect to specialized compensation arrangements," (c) in respect to a "compensation payment schedule," and (d) in respect to "protect[ion]" of compensation in the event of contract termination. Shaw says that his promise to cancel the Il Messaggero agreement was an amendment to the Uniform Players Contract that does not concern compensation,

specialized compensation, compensation schedules, or compensation protection; therefore, it is "null and void." (We have set out the amendment in an appendix to this opinion.)

Shaw's argument, while logical, fails to show that the arbitrator's contrary finding is unlawful. The reasons it fails are fairly straightforward. First, the argument concerns the proper interpretation of a contract negotiated pursuant to a collective bargaining agreement. Second, federal labor law gives arbitrators, not judges, the power to interpret such contracts. The Supreme Court, noting the strong federal policy favoring the voluntary settlement of labor disputes, has written that a labor arbitration award is valid so long as it "draws its essence" from the labor contract. *See United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). An award "draws its essence" from the contract so long as the "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *United Paperworkers Int'l v. Misco*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). We have held that "this language makes clear that any 'exception' to the normal rule (that forbids the court to find an arbitrator's interpretation outside the authority delegated to him by the contract) is extremely narrow." *Crafts Precision Indus., Inc. v. Lodge No. 1836, Int'l Assoc. of Machinists*, 889 F.2d 1184, 1185 (1st Cir.1989). Consequently, "we shall uphold an arbitrator's interpretation of a contract as long as we can find some 'plausible argument that favors his interpretation.'" *Id.* (quoting *Berklee College of Music v. Massachusetts Federation of Teachers Local 4412*, 858 F.2d 31 (1st Cir. 1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989)).

Third, one can find "plausible arguments" favoring the arbitrator's construction. Shaw's "rescission" promise defines the beginning of the compensation relationship. It also plausibly determines, at the very least, whether Shaw's compensation will begin at $1.1 million (and continue for three years) or whether it will begin at $1.2 million (and continue for only two years). *See* Appendix, *infra* (describing compensation schedule). More importantly, and also quite plausibly, Shaw's overall compensation might have been much different had he declined to promise to play for the Celtics in 1990–91, thereby forcing the Celtics, perhaps, to obtain the services of a replacement for that year. The NBA Commissioner, who reviews all player contracts, found that the term was related to "compensation," as did the arbitrator. We cannot say that their findings lack any "plausible" basis.

■ 2. *The arbitrator's order.* Shaw points out that he promised only "to exercise his right of rescission in the manner and at the time called for by the Messaggero contract." *See* p. 3, *supra*. The Messaggero contract permits him to send his rescission letter *"between June 20, 1990 and July 20, 1990."* (Emphasis added.) Therefore, he argues, the arbitrator acted unlawfully by ordering him to send the letter *on* June 20 rather than permitting him to send it between June 20 and July 20.

The short, conclusive answer to this argument is that because Shaw did not raise it in the district court, he cannot raise it now. *See Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 896 (1st Cir.1988); *Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987) (collecting cases); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979). In any event, Shaw agreed in paragraph 9 of his Celtics contract that if he was "attempting or threatening to play" for another team, the Celtics were entitled to "obtain from any court or arbitrator ... such equitable relief as may be appropriate." In light of the Celtics' need to know, well before July 20, whether Shaw would honor, or refuse to honor, his obligation to terminate Il Messaggero, the arbitrator's selection of June 20 as the date for termination would seem "appropriate" relief.

■ 3. *Notice.* Shaw says that the arbitration award is invalid because he did not receive proper notice of the proceedings. The relevant notice provision appears in Article XXVIII of the Collective

Bargaining Agreement, which is cross-referenced by Shaw's contract. It says, among other things, that when a player "attempts or threatens" not to play, a club may demand "expedited arbitration" of the dispute. In that case the arbitrator "shall convene a hearing "at the earliest possible time, but in no event later than 24 hours following" the demand for arbitration. The arbitrator "shall ... issue" his award "not later than 24 hours after the conclusion of the hearing;" and the "failure of any party to attend the hearing as scheduled shall not delay" it, nor prevent the arbitrator from "tak[ing] evidence" or "issu[ing] an award as though such party were present." The "notice" provision says that "the dispute ... shall be asserted by notice in writing or by telegram, return receipt requested, given to the other parties...." Shaw says that he did not receive "notice in writing ... return receipt requested."

The record shows the following undisputed facts. At Shaw's direction his attorney, W. Jerome Stanley, wrote the Celtics a letter stating that he (Stanley) had "been retained as counsel by Brian Shaw." On June 12, a Celtics representative personally served Stanley with written notice of the Celtics' demand for expedited arbitration. The next morning the arbitrator commenced the hearing. After hearing the Celtics' evidence, the arbitrator, at Stanley's request, adjourned the hearing until the following afternoon. Stanley phoned Shaw in California and left a message about the arbitration on Shaw's answering machine. Shaw received the message at 6:00 p.m., but he decided not to return Stanley's call.

It seems to us obvious that the arbitrator had the legal power to decide that the Celtics complied with the contract's notice provisions. He could (1) interpret the contract to require only substantial compliance with the notice provisions; (2) interpret the notice language to mean that the player must receive "notice in writing ... return receipt requested *or the equivalent;*" and (3) given the need for expedition, he could reasonably find that written notice to Shaw's lawyer plus *actual* oral notice to

Shaw amounted to "the equivalent" and, therefore, substantially complied with the contractual notice provision. We do not find such an argument "implausible," *see Crafts Precision,* 889 F.2d at 1185; *see also Misco,* 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286; and, given the need for a quick decision, the parties' agreement (in their contract) to obtain quick decisions through expedited arbitration proceedings, and the absence of any showing of substantial prejudice to Shaw, we do not see how one could characterize the notice to Shaw as "fundamentally unfair." *See Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.,* 607 F.2d 649, 651 (5th Cir.1979) ("[A]n arbitrator 'need only grant the parties a fundamentally fair hearing.' "). (quoting *Bell Aerospace Co. v. Local 516, UAW,* 500 F.2d 921, 923 (2d Cir.1974)); *Sunshine Mining Co. v. United Steelworkers Local 1038,* 823 F.2d 1289, 1295 (9th Cir.1987) (fundamental fairness requires only "adequate notice"); *Konkar Maritime Enter., S.A. v. Compagnie Belge D'Affretement,* 668 F.Supp. 267 (S.D.N.Y. 1987) (fundamental fairness satisfied by "actual" notice).

■ 4. *Continuance.* Shaw says that the arbitration proceedings were fundamentally unfair because the arbitrator refused to continue the hearing for one week to give Shaw a chance to attend the hearing and present evidence in his own behalf. The contract, however, does not require the arbitrator to continue the hearing; on the contrary, it specifically directs him to convene the hearing after 24 hour's notice and authorizes him to "take evidence and issue an award" notwithstanding "the failure of any party to attend." Given these agreed-upon procedures, the acute need for expedition in this case, the fact that Shaw was represented at the hearing by three lawyers able to present evidence and cross-examine witnesses, the fact that Shaw either did foresee (or should have foreseen) that his last-minute refusal to terminate Il Messaggero would probably trigger an expedited arbitration proceeding, and the absence of convincing evidence that Shaw would have benefited from a continuance, the ar-

bitrator's refusal to grant Shaw such a continuance was not "fundamentally unfair." *See Hoteles Condado Beach v. Union De Tronquistas Local 901,* 763 F.2d 34, 39 (1st Cir.1985) (fundamental fairness requires only that each party to a dispute be given "an adequate opportunity to present its evidence and arguments").

■ 5. *Representation.* Lastly, Shaw argues that the arbitration proceeding was invalid because he was not represented. The record before us shows, however, that on June 6 Stanley wrote the Celtics at Shaw's direction, saying that he had "been retained as counsel by Brian Shaw," and would be "available to resolve any issues" arising from Shaw's decision to continue playing for Il Messaggero; that Shaw concedes Stanley was his "agent;" that on June 12 he met with representatives of the Celtics and of Il Messaggero in Boston to resolve the dispute over Shaw's contract; that he retained two attorneys to accompany him to the June 13 arbitration proceeding in New York; and that he and one other of these attorneys made arguments (both orally and in writing) on Shaw's behalf. Given these facts, along with the considerations we have discussed previously (*i.e.,* the need for expedition and the agreed-upon expedited procedures), Stanley's statement that, although he was Shaw's "agent," he had not been "retained as Shaw's attorney in the arbitration," cannot show a violation of "fundamental fairness."

In sum, we find the arbitration award lawful; and, in doing so, it has not been necessary for us to consider the Celtics' additional argument that Shaw bears an especially heavy legal burden in this case because the Players Association does not support him. *Cf. Vaca v. Sipes,* 386 U.S. 171, 190–93, 87 S.Ct. 903, 916–18, 17 L.Ed.2d 842 (1967) (employee must show union decision not to bring grievance is arbitrary, discriminatory, or in bad faith).

### B. *The District Court Proceedings*

The district court, as we have pointed out, issued a preliminary injunction requiring Shaw to rescind "forthwith" his contract with Il Messaggero and forbidding him to play basketball for any team other than the Celtics during the term of his Celtics contract. The court also "enforced" an arbitration award containing essentially the same terms. Shaw argues that both the preliminary injunction and the enforcement order are unlawful. Since the district court correctly upheld the award's validity, Shaw's only remaining arguments are that the district court lacked discretion to award preliminary injunctive relief and that it mismanaged the proceedings below. We discuss both points briefly.

■ 1. *The preliminary injunction.* The disputed award in this case resulted from arbitration procedures contained in a collective bargaining agreement between a labor organization (the Players Association) and an employers' association (the NBA). Shaw bound himself to that collective bargaining agreement in his contract with the Celtics, the terms of which are themselves a product of collective bargaining between employees and employers. Well-established public policy embodied in statute, *see* 29 U.S.C. § 172(d), in Supreme Court decisions, *see United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp., supra,* and in numerous lower court opinions, strongly favors judicial action to "effectuate[ ] ... the means chosen by the parties for settlement of their differences under a collective bargaining agreement...." *American Mfg. Co.,* 363 U.S. at 566, 80 S.Ct. at 1346. That judicial action clearly may include a preliminary injunction enforcing an arbitration award, *see, e.g., New Orleans Steamship Ass'n v. General Longshore Workers Local 1418,* 626 F.2d 455, 466 (5th Cir.1980), *aff'd sub nom. Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982); *San Francisco Elec. Contractors Ass'n v. International Bhd. of Elec. Workers No. 6,* 577 F.2d 529

(9th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978), even if such a preliminary injunction gives the plaintiff all the relief it seeks, *see Selchow & Righter Co. v. Western Printing & Lithographing Co.,* 112 F.2d 430, 431 (7th Cir.1940); 11 C. Wright & A. Miller, *Federal Practice And Procedure* § 2948, at 447 & nn. 50–51 (1973) [hereinafter *Wright & Miller* ]; *Developments in the Law—Injunctions,* 78 Harv.L.Rev. 994, 1058 (1965) ("If all other requirements for preliminary relief are met, the fact that the plaintiff would get no additional relief if he prevailed on the merits should not deprive him of his remedy.").

The only legal question before us, therefore, is whether the district court acted outside its broad equitable powers when it issued the preliminary injunction. That is to say, did the court improperly answer the four questions judges in this Circuit must ask when deciding whether to issue a preliminary injunction. They are: (1) have the Celtics shown a likelihood of success on the merits? (2) have they shown that failure to issue the injunction would cause the Celtics "irreparable harm?" (3) does the "balance of harms" favor Shaw or the Celtics? and (4) will granting the injunction harm the "public interest?" Our examination of the record has convinced us that the court acted well within the scope of its lawful powers. *See Hyde Park Partners, L.P. v. Connolly,* 839 F.2d 837, 842 (1st Cir.1988) (preliminary injunctions are reviewed only for abuse of discretion).

To begin with, the Celtics have shown a clear likelihood of success on the merits. As we pointed out in section "A," the arbitration award is lawful, and courts have authority to enforce lawful arbitration awards. The Celtics also have demonstrated irreparable harm. Without speedy relief, they will likely lose the services of a star athlete next year, *see Wright & Miller* § 2948, at 439 & n. 34 (1972) (collecting cases that have found irreparable harm "in the loss by an athletic team of the services of a star athlete"), and, unless they know fairly soon whether Shaw will, or will not play for them, they will find it difficult to plan intelligently for next season. Indeed, in his contract Shaw expressly

> represents and agrees that he has extraordinary and unique skill and ability as a basketball player, . . . and that any breach by the Player of this contract will cause irreparable injury to the Club.

Further, the court could reasonably find that the "balance of harms" favors the Celtics. Of course, a preliminary injunction, if ultimately shown wrong on the merits, could cause Shaw harm. He might lose the chance to play in the country, and for the team, that he prefers. On the other hand, this harm is somewhat offset by the fact that ultimate success on the merits— *i.e.,* a finding that Shaw was not obligated to terminate Il Messaggero after all— would likely result in the following scenario: Shaw might still be able to sign with Il Messaggero and, if not, he would always have the Celtics contract of over $5 million to fall back upon. At the same time, the court's *failure* to issue the injunction, if the merits ultimately favored the Celtics, could cause them serious harm of the sort just mentioned (*i.e.,* significantly increased difficulty in planning their team for next season). Given the very small likelihood that Shaw would ultimately prevail on the merits, and the "comparative" harms at stake, the district court could properly decide that the overall "balance" favored the Celtics, not Shaw.

Finally, the court could properly find that issuing a preliminary injunction would not harm the public interest. Indeed, as we have pointed out, the public interest favors court action that "effectuate[s]" the parties' intent to resolve their disputes informally through arbitration. *See* sources cited at pp. 1047–48, *supra.* Where the dispute involves a professional basketball player's obligation to play for a particular team, one could reasonably consider expeditious, informal and effective dispute-resolution methods to be essential, and, if so, the public interest favoring court action to "effectuate" those methods of dispute-resolution would seem at least as strong as it is in respect to work-related disputes typically arising under collective bargaining agreements. *See New England Patriots Foot-*

*ball Club, Inc. v. University of Colorado,* 592 F.2d 1196, 1200 (1st Cir.1979) (collecting cases in which professional sports players were enjoined from playing for rival teams). Shaw, while conceding that the public also has an interest in seeing that contracts between consenting adults are honored, points to a general policy disfavoring enforcement of personal service contracts. That latter policy, however, typically prevents a court from ordering an individual to perform a personal service, *see* H. McClintoch, *McClintoch on Equity* § 63, at 164 (2d ed.1948); it does not prevent a court from ordering an individual to rescind a contract for services and to refrain from performing a service for others.

■ Shaw makes an additional argument. He notes that courts will not provide equitable relief such as an injunction to a party with "unclean hands," and he argues that the Celtics' hands are not clean. To support this argument, he has submitted an affidavit saying, in effect, that he signed the contract in a weak moment. His trip to Italy had made him "homesick;" he was "depressed" by what he viewed as undeserved and "negative criticism" in the Italian press; he was not represented by an agent; the Celtics had been urging him to sign up; he read the contract only for about 20 minutes while he was driving around Rome with a Celtics official; and no one ever explained to him that if he did not sign and played with Il Messaggero for another year, he would become a "free agent," able to bargain thereafter with any American team, perhaps for an even greater salary than the Celtics were willing to pay him.

Other evidence in the record, however, which Shaw does not deny, shows that he is a college graduate; that he has played under contract with the Celtics before; that the contract is a standard form contract except for a few, fairly simple, rather clear, additions, *see* Appendix, *infra;* that he had bargained with the Celtics for an offer that increased from $3.4 million (in December) to $5.4 million (less than one month later); that he looked over the contract before signing it; that he told the

American consul in Rome (as he signed it) that he had read and understood it; and that he did not complain about the contract until he told the Celtics in June that he would not honor it.

Given this state of the record, the district court could easily, and properly, conclude that the Celtics' hands were not "unclean." The one case Shaw cites in support of his position, *Minnesota Muskies, Inc. v. Hudson,* 294 F.Supp. 979, 981 (M.D.N.C.1969), is not on point. The player in *Muskies* had a contract with Team A that permitted Team A, not the player, to renew the contract for additional years. Team B lured the player away from Team A even though it knew that Team A intended to exercise its contractual right to keep the player. The court held that this contractual interference amounted to "unclean hands" and refused Team B's request for an injunction preventing the player from returning to Team A. Here, in contrast, Il Messaggero has no contractual right to retain Shaw; whether or not the contract is renewed or rescinded is entirely up to Shaw, not Il Messaggero. Under those circumstances, we cannot find anything improper, "unclean," or unfair about the Celtics' convincing Shaw (indeed, paying Shaw) to exercise his contractual right in their favor. *Cf. Restatement (Second) of Torts* § 768 (1979).

In sum, issuance of the preliminary injunction was legally proper.

■ 2. *The Arbitration Award Enforcement Order.* At the same time the court issued the preliminary injunction, it also ordered the arbitration award enforced. The enforcement award was the equivalent of a permanent injunction and amounted to a final judgment on the merits. This action made considerable practical sense, for the preliminary injunction and the enforcement order, as we understand them, amounted to the same thing. Once the preliminary injunction issued, the case was virtually over for Shaw and he had lost. Nevertheless, Shaw argues that even if the preliminary injunction was lawful, the order enforcing the award was not proper, for, in Shaw's view, the entry of

that final order so soon after the complaint was filed, deprived him of certain important procedural rights. In particular, he says that granting enforcement of the award was like granting the Celtics summary judgment. The Federal Rules of Civil Procedure normally require the plaintiff to wait 20 days before moving for summary judgment, *see* Fed.R.Civ.P. 56, and only 11 days elapsed between the filing of the complaint and the court's decision.

In our view, Shaw's argument is unduly formal. The important question, in respect to time limits such as those Shaw cites, is whether failure to observe them somehow injured Shaw. Was he prevented from making a defense he might otherwise have made? Was he unable to prove a critical fact that he might otherwise have been able to show? Shaw indicated his awareness that the district court might award relief on an expedited basis. He presented affidavits, statements, and arguments. We have not found anywhere in the record any offer by counsel to produce additional specific, significant factual evidence or information. We asked counsel at oral argument whether Shaw had additional evidence that might have affected the district court's decision, and he could not point to anything not already in the record. The district court itself said at hearing that "there simply is not more information that would affect the decision in this case." It is well-established that "where no potential disputed material issue of fact exists, a summary judgment will not be disturbed even though the district court disregarded the procedure which should have been followed." *Milwaukee Typographical Union No. 23 v. Newspapers, Inc.*, 639 F.2d 386, 391 (7th Cir.), *cert. denied*, 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 119 (1981); *see Kaestel v. Lockhart*, 746 F.2d 1323, 1324 (8th Cir.1984) (same); *General Elec. Credit Corp. v. Montgomery Mall Limited Partnership*, 704 F.2d 1173, 1175 (10th Cir.) (same), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); *Hoopes v. Equifax, Inc.*, 611 F.2d 134, 136 (6th Cir. 1979) (same); *see also Jensen v. Farrell Lines, Inc.*, 477 F.Supp. 335, 340 n. 3 (S.D. N.Y.1979) (expedited decision on the merits

was not improper despite party's assertion "that discovery would have provided an opportunity to develop more evidence" where "no offered proof regarding specific areas of evidence which would have been relevant to the issues ... was made"), *rev'd on other grounds*, 625 F.2d 379 (2d Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981).

The more formal, and more direct, answer to Shaw's formal argument is that the district court followed proper procedure. The court, in effect, consolidated the proceedings on the merits of the case with the hearing on the preliminary injunction motion. Fed.R.Civ.P. 65(a)(2) specifically authorizes a court to "order the trial of the action on the merits to be advanced and consolidated with the hearing of the application" for preliminary injunction. And, since courts do not hold a "trial" where no genuine issue of material fact is in dispute, *cf.* Fed.R.Civ.P. 56, this provision logically authorizes whatever "summary judgment" proceedings are appropriate. Where prompt resolution of a matter is important, courts have moved swiftly to order final relief. *See, e.g., Burlington Northern R.R. Co. v. Sheet Metal Worker's Int'l*, 636 F.Supp. 809 (N.D.Ill.1986) (six days between filing of complaint and final judgment); *New Jersey Transit Rail Operations, Inc. v. International Bhd. of Boilermakers*, 550 F.Supp. 1327 (Regional Rail Reorg. Ct.1982) (twelve days between complaint and final judgment); *see also Rohm and Hass Co. v. EPA*, 525 F.Supp. 921 (E.D.Pa.1981) (two weeks), *aff'd*, 651 F.2d 176 (3d Cir.1981).

We add that the case before us, while arising in the world of professional sports, involves a collective bargaining agreement between employees and employers, an agreement that provides for expedited arbitration. The Supreme Court has frequently emphasized the importance of permitting unions and employers to create informal dispute-resolution mechanisms that satisfy both, and it has given courts broad authority to ensure that those agreed-upon mechanisms are effective. In *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456–

57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957), for example, the Supreme Court held that a union can obtain specific performance of an employer's promise to arbitrate. And in *Boys Markets, Inc. v. Retail Clerks Union Local 170*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), upholding the power of federal courts to enjoin a strike, the Court wrote,

> While it is of course true ... that other avenues of redress, such as an action for damages, would remain open to an aggrieved employer, an award of damages ... is no substitute for an [injunction. Indeed,] ... an action for damages prosecuted during or after a labor dispute would only tend to aggravate industrial strife and delay an early resolution of the difficulties between employer and union.

*Id.* at 248, 90 S.Ct. at 1591. In our view, the legal principles that grant courts broad powers to enforce arbitration agreements and to use their contempt powers or equitable powers, even enjoining strikes, all in support of arbitration, permit the district court's expedited enforcement of the arbitration award. The court used procedures that preserved basic fairness while permitting the resolution of a dispute in the expeditious manner called for by the circumstances and the parties' own agreement.

In a final bid for relief, Shaw points to a state law governing labor arbitration, Mass. Gen. Laws ch. 150C, § 11, which says that an application to *vacate* a labor-arbitration award must be made within thirty days. Shaw says that this state-law time limit on a party's right to ask a court to vacate an award prevented the district court from enforcing the award before the thirty-day period expired. The time-limit provisions of Mass. Gen. Laws ch. 150C, § 11 do not prevent the court from ruling as it did. Of course, federal courts sometimes fashion rules for decision under § 301 by looking at appropriate state statutes. *See United Automobile Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 701, 86 S.Ct. 1107, 1110, 16 L.Ed.2d 192 (1966); *Lincoln Mills*, 353 U.S. at 457, 77 S.Ct. at 918 (dicta). We do not understand Shaw to argue, however, that § 301 necessarily incorporates this provision of Massachusetts law. Regardless, the language of the Massachusetts law, literally read, does not limit a federal court's authority to enforce an award under federal law, and we would not construe that state law language as doing so.

For these reasons, the order of the district court is

*Affirmed.*

The court's mandate shall issue forthwith.

## APPENDIX

### UNIFORM PLAYER CONTRACT

*Exhibit I—Compensation*

Player: Brian Shaw

Club. Boston Celtics

Date:

| Season | Compensation |
| --- | --- |
| 1989-90* | $1,200,000.00 |
| 1990-91* | $1,100,000.00 |
| 1991-92 | $1,200,000.00 |
| 1992-93 | $1,300,000.00 |
| 1993-94 | $1,400,000.00 |

*Payment Schedule of Compensation* (if different from paragraph 2):

*Bonuses* (include dates of payment):

The Club shall pay the Player a Signing Bonus of $450,000.00 within 10 days following the approval of this contract by the Commissioner of the NBA.

*OTHER COMPENSATION ARRANGEMENTS:*
* The Player and Club acknowledge that Player is currently under contract with Il Messaggero Roma (the "Messaggero Contract") for the 1989-90 & 1990-91 playing seasons. The Player represents that in accordance with the terms of the Messaggero Contract, the Player has the right to rescind that contract prior to the 1990-91 season and the Player hereby agrees to exercise such right of rescission in the manner and at the time called for by the Messaggero Contract.

In the event that the Player has fully performed his obligations under the Messaggero Contract prior to the conclusion of the 1989-90 NBA season, including playoffs, and is contractually free to play in the NBA, the Player shall perform the services called for under this contract for the remainder of the 1989-90 NBA season on a pro rata basis.

Initialled

RECEIVED & RECORDED

Player Club

JAN 29 1990

COMMISSIONER