[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON APPLICATION FOR TEMPORARY ANDPERMANENT INJUNCTION
On August 17, 1994, the plaintiff Don Lark, a television news anchorman, filed this action seeking both equitable relief and damages against the defendant Post-Newsweek Stations, Connecticut, Inc. (doing business as WFSB Channel 3 and thus hereinafter referred to as "the station") for the alleged anticipatory breach of his employment contract. The plaintiff also sued a second defendant, Armond D. Terzi a/k/a Al Terzi, on the grounds that he would allegedly be replacing the plaintiff.
On August 29, 1994, the defendants sought summary judgment on the plaintiff's request for injunctive relief maintaining that, as a matter of law, the relief could not be granted because (1) courts do not order specific performance in personal service contracts and (2) specific performance would violate the defendant station'sfirst amendment rights. After a hearing, the court denied the defendant's motion on September 29, 1994 on the grounds that several factual issues remained extant
The hearing on the application for injunctive relief commenced on October 11, 1994 and continued on various dates to October 21, 1994. The parties agreed that this court would consider not only the application for the temporary injunction but also the application for the permanent injunction. On October 17, 1994, the parties submitted a stipulation of facts which is set forth as follows:
 1. Plaintiff, Don Lark is a resident of Avon, Connecticut.
 2. Defendant, Post-Newsweek Stations, Connecticut, Inc. (hereinafter CT Page 11851 referred to as "WFSB") is a Delaware corporation registered to do business in Connecticut, with a place of business at 3 Constitution Plaza, Hartford, Connecticut.
 3. Defendant, Post-Newsweek is a licensee of television station WFSB, Hartford, Connecticut.
 4. WFSB broadcasts television news and entertainment programming over Channel 3 and various cable television systems.
 5. Plaintiff, Don Lark has been employed by WFSB since 1979. During the employment period Lark entered into a series of written employment agreements with WFSB.
 6. Plaintiff, Don Lark is and has been employed by the Defendant corporation pursuant to a written contract of employment.
 7. The terms of the written employment agreements were set forth in a series of letter agreements with the Plaintiff and a generally standard form Post-Newsweek Stations, Inc. Talent Contract Clauses document.
 8. The terms of the present Employment Contract are comprised of a two-page letter agreement and eight-page Post-Newsweek Stations, Connecticut, Inc. Talent Contract Clauses document. The contact term is for four years.
 9. The term of the Plaintiff's present employment contract was for four years, from August 2, 1991 through August 1, 1995. CT Page 11852
 10. During the period August 2, 1991, through the present Plaintiff anchored the 6:00 and 11:00 p. m. news programs, among other newscasts.
 11. Defendant has a large viewer audience for the 6:00 and 11:00 p. m. news programs.
 12. The Defendant Post-Newsweek recently added Al Terzi as an employee to its news organization. Al Terzi was hired as a primary anchor.
 13. Prior to hiring by WFSB, the Defendant Al Terzi was an employee of WTNH, New Haven, Connecticut.
 14. The law firm of Cohen Wolf were compensated by WFSB in the amount of $2,000.00 for legal advice regarding the meaning of a noncompetition clause in Al Terzi's contract with his former employer. WFSB also compensated Howard Abrahams in the amount of $4,100.00 for services provided in connection with the contract of Al Terzi.
 15. On August 17, 1994, Plaintiff filed an Application for Temporary Injunction seeking to restrain Post-Newsweek from violating any of the terms of his employment contract (a) by removing Plaintiff from his position as anchorman on the 6:00 and 11:00 news programs; and (b) by announcing publicly or privately in any form or medium that Plaintiff is going to be removed and/or replaced as the anchorman on the 6:00 and 11:00 p. m. news programs.
16. Paragraph three of the document CT Page 11853 entitled "Talent Contract Clauses" in the present employment contract states in relevant part:
 "The services furnished by employee under the agreement shall be subject at all times to the discretion and control of Post-Newsweek Stations, and employee expressly acknowledges the right of Post-Newsweek Stations in its discretion to delete from or add to any program material."
 17. The letter agreement in the present employment contract provides in Paragraph two:
 You shall participate personally as anchor on the 6:00 and 11:00 p. m. news and any other programs designated by the news director and/or the general manager and shall fulfill such responsibilities relating to any program as reasonably may be required."
 18. The letter agreement in the present employment contract provides in Paragraph nine:
 "Insofar as anything in the attached talent contract clauses is at variance or in conflict with anything in this letter agreement, the provisions of this letter agreement shall govern."
 19. Plaintiff, Don Lark is one of the most recognized television newsanchor CT Page 11854 persons in Connecticut.
 20. Defendant, Al Terzi was, until recently, an employee of television station WTNH, New Haven, Connecticut as its top anchorman.
 21. Defendant, Al Terzi is one of the most recognized television news personality in Connecticut.
 22. An anchor person has an interest in protecting his reputation.
 23. Paragraph ten of the Talent Contract Clauses document in the Plaintiff's present employment contract provides:
 "PAY, NO PLAY
 Nothing, in the Agreement shall be deemed to obligate PNS to use Employee's service on any program or to broadcast or otherwise exploit any program, or recording thereof, for which such services have been performed. PNS shall have fully discharged its obligations under the Agreement by remitting the compensation specified therein to or on behalf of Employee.
Other facts presented at the hearing will be discussed as appropriate.
The plaintiff has filed this action arguing primarily that as paragraph two of his letter agreement states, in part, that "[y]ou shall participate personally as anchor on the 6:00 and 11:00 p. m. news", that he must be allowed to deliver the news during those time slots for the CT Page 11855 duration of his contract. The defendant counters that paragraph ten of the Talent Contract, incorporated as part of his letter agreement, authorizing the station to keep the plaintiff off the air but requiring the station to pay the plaintiff's salary ("pay no play"),[1] defeats plaintiff's argument. Thus, the station maintains that even if the plaintiff is taken off the air, as long as it pays the plaintiff there is no breach of the contract. Additionally, it argues that the discretion afforded to the station to keep its anchors off the air is supported by the language of paragraph three of the Talent Contract.[2]
The plaintiff's response is that as paragraph nine of the letter agreement which states that to the extent there is a conflict between the provisions of the clauses in the letter agreement and the Talent Contract, the letter agreement provisions control,[3] the "you shall participate" language of paragraph two, overrules the pay no play language of paragraph ten. A review of these clauses and traditional contract interpretation and equitable relief doctrines resolves this dispute.
In Barnard v. Barnard, 214 Conn. 99, 109-110 (1990) our Supreme Court stated that:
 "A contract is to be construed as a whole and all relevant provisions will be considered together." Lar-Rob Bus Corporation v. Fairfield, 170 Conn. 397, 407, 365 A.2d 1086 (1976); see Blatt v. Star Paper Co., 160 Conn. 193, 200, 276 A.2d 786 (1970); 17 Am.Jur.2d, Contracts § 258. In giving meaning to the terms of a contract, we have said that "a contract must be construed to effectuate the intent of the contracting parties.'" Sturman v. Socha, 191 Conn. 1, 10, 463 A.2d 527
(1983); Leonard Concrete Pipe Co. v. C. W. Blakeslee Sons, Inc., 178 Conn. 594, 598, 424 A.2d 277 (1979); Ginsberg v. Mascia, 149 Conn. 502, 506, 182 A.2d 4 (1962). In ascertaining intent, "we consider not only the language in the contract but also the circumstances surrounding the CT Page 11856 making of the contract, the motives of the parties and the purposes which they sought to accomplish." Connecticut Co. v. Division 425, 147 Conn. 608, 616, 164 A.2d 413 (1960); Marcus v. Marcus, 175 Conn. 138, 141, 394 A.2d 727 (1978). "The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used." Ives v. Willimantic, 121 Conn. 408, 411, 185 A. 427 (1936); Leonard Concrete Pipe Co. v. C. W. Blakeslee Sons. Inc., supra; Powell v. Burke, 178 Conn. 384, 387, 423 A.2d 97 (1979). This is so where the parties have their agreement in writing. Sturman v. Socha, supra; Robert Lawrence Associates. Inc. v. DelVecchio, 178 Conn. 1, 14, 420 A.2d 1142 (1979). "In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." Sturman v. Socha, supra, 10; Marcus v. Marcus, supra, 141-42; Sturtevant v. Sturtevant, 146 Conn. 644, 647-48, 153 A.2d 828 (1959). Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity CT Page 11857 and words do not become ambiguous simply because lawyers or laymen contend for different meanings. Downs v. Nation al Casualty Co., 146 Conn. 490, 494, 152 A.2d 316 [1959].
Under the terms of Mr. Lark's contract, he delivers the news at 6:00 and 11:00 p. m. The testimony at trial indicted that the 6:00 program is the most widely viewed news program and constitutes a primary anchor position along with the 5:00, 5:30, 10:00 and 11:00 newscasts. A primary news anchor commands a higher salary than a secondary (6:00 a.m., 12:00 p. m., weekend evenings) anchor position. This time specific assignment held by the plaintiff is not uncommon in the industry according to the testimony of Steven Dickstein an attorney whose practice for 18 years has been "dedicated to the representation of on air television newspeople involved in news, weather and sports" (and thus, obviously on the other side of the table from the station). Indeed, at least three other anchors at the station have such assignments — not to mention many others in the industry. Yet, according to Mr. Dickstein, a specific assignment only means that a station cannot unilaterally or forcibly require the talent to change his or her job to another function. He also remarked that notwithstanding this clause, it is common for a station to request a change in the agreed upon duties. Indeed, it was noted that in Mr. Lark's earlier contract, he was requested to assume more duties by delivering the 5:00 news and, accordingly, was paid an increased salary.
While the time specific assignment is an important part of his contract, it does not appear that Mr. Lark actually negotiated for this provision. Notwithstanding the allegations of his complaint, neither party discussed the 6:00 and 11:00 slots during the negotiations. Moreover, he did not accept less compensation for the assignment as his compensation in the existing contract increased at the same rate as it had throughout his fourteen years with station.
The intention of the parties is to be examined in light of the situation of the parties and the circumstances connected with the transaction. In this case, the contract was reached with very little negotiation — it was, to a CT Page 11858 large extent, a continuation of existing duties with appropriate salary increases. The parties had previously entered into five contracts — all which contained similar provisions concerning the station's discretion to utilize the plaintiff's services and the pay no play clause. Agreements are to be interpreted in accordance with relative usage; usage is defined to be the customary practice. Restatement, Second, Contracts, § 219, 220. A usage of trade is a usage having such regularity of observance in a vocation or trade as to justify an expectation that it will be observed with respect to a particular agreement. Id., § 222; General Statutes § 42a-1-205;Barnard v. Barnard, supra, 109.
The pay no play clause is, according to Attorney Dickstein, "generally contained in the . . . standard talent contract clauses" and "states what . . . is obvious, and that is that the station fulfills its obligations under the contract by paying wages and benefits under the terms of the contract and need not air any product in which the client appears . . . and in fact need not have the client perform any work at all. But that the station's obligations are satisfied simply by paying its compensation under the contract." The pay no play provision in Mr. Lark's contract is "pretty much a standard version of contracts in the industry." In discussing the alleged conflict between the time specific assignment and the pay no play clause, he testified that the two clauses are "essentially unrelated" and that there is "no conflict between the two provisions."
This court does not believe that there is a real conflict between the time specific assignment clause and the pay no play clause. The language "you shall participate personally as anchor on the 6:00 and 11:00 News" only describes Mr. Lark's employment and specific time slot. Both parties recognize that the station cannot force Mr. Lark to deliver the news. Thus, if Mr. Lark were refusing to deliver the news at that time, the station could not seek mandatory injunctive relief ordering him to perform the contract. See generally 5A Corbin Contracts § 1204. Recognizing that the station cannot make Mr. Lark go on the air, the phrase "shall participate" can only be interpreted to mean a delineation of duties. In other words, Mr. Lark's assignment is the 6:00 and 11:00 news as CT Page 11859 opposed to other time slots. This interpretation is also consistent with his 1979 and 1982 contracts which, whilenot time specific, did contain the same "you shall participate personally" language. There is certainly no claim being made that this phrase without a specific time entitles Mr. Lark to on air time. The later modification to include the specific news shows does not change the meaning of the sentence: the job description.
"A contract is to be construed as a whole and all relevant provisions will be construed together." Lar-RobBus Corporation v. Fairfield, 170 Conn. 397, 407 (1976). Moreover, "[p]arties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible."Hatcho Corporation v. Della Pietra, 195 Conn. 18, 23
(1985). There is nothing inconsistent about the two clauses whether from a construction or usage point of view. Surely Mr. Lark, as an experienced news anchorperson, having received the assistance of counsel in the review of his contracts, knew the meaning of pay no play. The clause existed in the earlier contracts and there was no testimony that he attempted to remove it from any of the contracts. To adopt the plaintiff's position would require the court to find that the pay no play clause is meaningless.
Issuance of an injunction lies within the sound discretion of the trial court, exercised within the recognized principals of equity. Berin v. Olson, 183 Conn. 337,340, (1981); Nicoli v. Frouge Corp. , 171 Conn. 245,247, (1976); Moore v. Serafin, 163 Conn. 1, 6 (1972). An applicant seeking an injunction must demonstrate that:
(a) he has no adequate remedy at law;
(b) he is being irreparably injured; and,
 (c) upon a balancing of the equities he is more entitled to a judgment than the defendant.
See, Griffin v. Commission on Hospitals and HealthCare, 196 Conn. 451, 456-458,.
Both parties agree that in Connecticut, as well as in the majority of other jurisdictions, injunctive relief does CT Page 11860 not generally lie for the enforcement of personal service contracts. Burns v. Gould, 172 Conn. 210, 214-15 (1977). See Restatement, Second, Contracts, § 367(1); 71 Am.Jur.2d, Specific Performance § 163, and cases cited therein. See also McKnight v. General Motors Corp. , 908 F.2d 104,115 (7th Cir. 1990). Indeed, as noted by the defendant, the plaintiff has failed to cite to any Connecticut cases in which the court has issued such relief.
Over 100 years ago, our Supreme Court stated, in a different fact situation, that "[c]ontracts for personal service are matters for Courts at law, and equity will not undertake a specific performance." (Citations omitted).William Rogers Mfg. Co. v. Rogers, 58 Conn. 356, 363-64
(1890) (refusing to specifically enforce personal service contract, in which defendant was to perform as general manager for plaintiff's business). More recently, in Burnsv. Gould, supra, the court again stated that, because "[c]ontracts of personal service are not specifically enforceable, . . . the plaintiff [can] not be compelled to complete his performance." Id., 214-15, citing WilliamRogers Mfg. Co. v. Rogers, supra, 364-65.
The court further stated that:
 The normal rule on an employment contract is that when the employee is prevented from fully performing because the employer wrongfully fires him, the employee can recover the wages he would have earned under the contract, minus any wages which he has earned or could have earned elsewhere, and the burden of proof of the latter is on the employer.
Burns v. Gould, supra, 221, citing Carter v.Bartek, 142 Conn. 448, 451-52 (1955).
The general rule set forth by the supreme court inWilliam Rogers Mfg. Co. v. Rogers, supra, has also been followed by Connecticut trial courts. See, e.g., Solomanv. Hall-Brooke Foundation, Superior Court, Judicial District of Fairfield at Bridgeport, Docket No. 213998, Lexis 297 (February 11, 1992, Katz, J.) (noting at page 21 that, all other things being equal, the court would nonetheless be "exceedingly reluctant" to order CT Page 11861 reinstatement of the plaintiff, because "[i]t is well established that specific enforcement of the employment relationships is among the most rarely granted of injunctive remedies"); Herman v. St. Vincent's MedicalCenter, 3 CSCR 205, 206 (January 20, 1988, Licari, J.) (refusing to grant the plaintiff's application for a temporary injunction to retain his employment status at the defendant hospital, because "[o]ur courts do not enforce personal service contracts by way of injunctive relief");Bell v. Hartford Hospital, 1 CSCR 709, 709 (August 25, 1986, Aronson, J.) (refusing to invoke equitable powers of court to require defendant hospital to take plaintiff back into its employ, because employment contracts "are not specifically enforceable"); Mele v. High Standard Mfg. Co.,13 Conn. Sup. 47, 52 (1944) (refusing to reinstate plaintiff employee pursuant to arbitration award, because rule enunciated in William Rogers Mfg. Co. v. Rogers, supra, "applies whether it be the employer or the employee who is seeking the relief"). See also 5A Corbin, Contracts
§ 1204, ("[i]t is almost universally held that a contract for personal services will not be specifically enforced, either by affirmative decree or by an injunction").
There are several reasons why courts have refused to specifically enforce contracts involving personal services:
1. the presence of an adequate remedy at law;
 2. the impossibility of a court coercing the rendering of personal services;
 3. the aura of involuntary servitude associated with the compulsion of services;
 4. the difficulty of judicial supervision over such a decree;
 5. the inexpediency of attempting to enforce such a decree; and
 6. the continuance of hostile, intolerable employment relationships.
See 71 Am.Jur.2d, Specific Performance § 164 and cases cited therein. See also McKnight v. General Motors Corp. , CT Page 11862 supra, 115; Solomon v. Hall-Brooke Foundation, supra.
While the rule denying specific performance of contracts for services is one that is generally stated without reservation, and is almost universally applied, there are, nevertheless, exceptions to it. Our courts have carved an exception in cases where the contract stipulates for special, unique or extraordinary personal services or acts. William Rogers Manufacturing Company v. Rogers, supra, 364. Thus, where one possesses some special, unique, or extraordinary qualification; where it would be difficult, if not impossible, to replace a person's services; and where damages would be inadequate to remedy the loss, equity may enforce a contract for personal services by an injunction restraining the employee from leaving the services of his employer. See 42 Am.Jur.2d, Injunctions §§ 104-110, and cases cited therein. See alsoVick Realty Co. v. Fassett, 15 Conn. Sup. 82, 83-84 (1947).
Moreover, at least one court has specifically enforced contracts for personal services, at the request of those who were to render said services. In American Associationof University Professors v. Bloomfield College Chapter, 129 N.J. Sup. 249, 322 A.2d 846 (1974), aff'd, 346 A.2d 615
(1975), the appellate court ordered the reinstatement of thirteen tenured faculty members who had been fired due to alleged financial reasons, after adopting the trial court's position that "the general rule (denying equitable relief in personal service contracts) is not inflexible and that the power of a court of equity to grant such remedy depends upon the factual situation involved and the need for that type of remedy in a particular case." Id., 618. Specifically, because the court found that the termination of the plaintiffs' employment contracts was not the result of dissatisfaction by their employer, and because the ascertainment of damages in the case was not certain, the court ordered reinstatement.
The plaintiff maintains that as the station tacitly acknowledged Mr. Lark's uniqueness in paragraph nine of the Talent Contract Clause[4] the court should grant the requested injunctive relief. This court does not agree. The exception discussed in Rogers allows a party to restrain an employee from leaving and working for a competitor. Id., 365. In fact it is similar to or the CT Page 11863 equivalent of a covenant not to compete. It is commonly utilized in the sports area. See Boston Celtics Ltd.Partnership v. Shaw, 908 F.2d 1041, 1048 (1st Cir. 1990);Nassau Sports v. Peters, 352 F. Sup. 870, 876 (E.D.N Y 1972); Dallas Cowboys Football Club. Inc. v. Harris,348 S.W.2d 37, 42 (Tex.Civ.App. 1961). See also AmericanBroadcasting Cos. v. Wolf, 438 N.Y.S.2d 482, 486,420 N.E.2d 363 (1981) and Williston, Contracts, Third Edition, 1423. The recognition of uniqueness in paragraph nine does not provide Mr. Lark a basis for injunctive relief.
This court heard from a number of witnesses on the issue of irreparable harm. Mr. Lark's claim, of course, is that if he is removed from the 6:00 and 11:00 p. m. news shows, his career would be irreparably harmed and any resulting damage could not be remedied by a simple monetary payment. It should first be noted that, although contested by the station, it is clear to the court that the station's management has for some time concluded that it would replace Mr. Lark with Mr. Terzi. The reason is based, in part, on Nielsen ratings. While there was some early thought that Mr. Lark might wish to relocate to the Detroit area, that does not seem to have been a true motivating factor for the station. At the same time, however, the station had expressed a clear desire to continue its relationship with Mr. Lark — albeit with his hosting other primary news shows and at a much reduced salary. Mr. Lark refused such offers and unlike the not uncommon scenario addressed by Mr. Dickstein in which the parties agree to a new contract, a stalemate occurred leading up to this suit.
After this hearing terminated, the station did indeed exercise the pay no play clause informing the plaintiff that he was not to return to his scheduled assignments on the air. The station did advise that it would continue to pay his salary.[5] Mr. Lark's fear of removal was obviously well founded.
While rejecting much of Mr. Dickstein's testimony, Mr. Lark does adopt his belief that not working (a pay no play scenario) is not desirable, will not enhance a talent's career and will impact a talent's efforts to secure replacement employment. Moreover, and especially important to this case, Mr. Dickstein commented that the financial impact of such a scenario is difficult to measure. Mr. CT Page 11864 Dickstein did backpeddle somewhat from this statement indicating that if his client was not working, he might be negotiating with less power than if his client were on the air. Indeed, he stated: "[w]hether or not that translates into real dollar losses I don't know. But that's what I would be afraid of."
Mr. Lark's own witness, John Kosinski, testified that while being off the air could create a stigma, the real question was the reason for not being on the air. Additionally, he believed that he could quantify, in dollars, the impact of such removal utilizing the data collected by the Radio and Television News Directors Association. He believed the figure would be, for this market, between $50,000 and $100,000 per year.
Mr. Donald Fitzpatrick, the owner of Don Fitzpatrick Associates of San Francisco, the largest on air television personnel search agency in the United States, testified on behalf of the station. He stated that news anchors who appear on any of the weekday nightly news shows (5:00, 5:30, 6:00 and 11:00 p. m.) are considered primary anchors and that a change from one primary show to another would not affect an anchor's marketability. In addition, he indicated that even if an anchor were not on the air (for a period of less than one year), his or her marketability would not be impacted.[6]
Mr. Fitzpatrick also testified that the broadcasting market nationwide has changed dramatically as a result of the Fox network's recent acquisition of the National Football League's contract. Evidently, due to the resulting switch by a number of stations, over 2000 jobs including primary anchor positions, have been created in the market since May 1994. Mr. Fitzpatrick indicated that Mr. Lark is highly marketable as an experienced primary male anchor. As a result of all the witnesses' testimony, this court does not believe that Mr. Lark has proved that he has been irreparably harmed.
As noted there are several other reasons why courts have denied relief in personal service contracts. Courts have traditionally declined to enter the workplace, in part, because of the difficulty of judicial supervision. As stated by the court in Solomon v. Hall BrookeCT Page 11865Foundation, supra, 21, "[w]hen a contract calls for services over a period of time, especially when such services require special skill, knowledge, and judgment and discretion, it would be impracticable, if not impossible, for a court to provide the continuous supervision necessary to enforce this kind of order for specific performance." Courts have also been reluctant to force the continuation of a hostile or intolerable employment relationship. In this case, the defendant has strongly argued that the plaintiff's allegations cast a cloud over the station's reputation for integrity and sincerity. The station's logo is "news you can trust from people you know" and it maintains that it would be intolerable (as well as bizarre) to be forced to have as its spokesman a person who publicly challenges its trustworthiness. The court believes that this claim has merit. Additionally, while there is no evidence of open hostilities, this court did hear testimony that the litigation has created a "huge distraction" in the news room.
As part of the presentation of nightly news, the anchor and management are obligated to discuss, prepare, and review the proposed news stories. Management is obviously entitled to exercise its right to decide which stories will be covered, by whom, etc. Although said in a different context, the statement of Judge Sofaer in WPIX,Inc. v. League of Women Voters, 595 F. Sup. 1484, 1494
(S.D.N.Y. 1984) is particularly apt in this case: "[t]he courts simply are not the proper agency for making operational decisions about media coverage." In addition to any other reasons, this court is not prepared to force this relationship.
Finally, the defendant argues that granting specific performance would violate its first amendment rights to editorial control. Essentially it posits that the station must be free to determine the content and manner of its news reporting. As noted by the defendant, in PittsburghPress Co. v. Human Relation Commission, 413 U.S. 376, 391
(1973), the United States Supreme Court stated that any restriction whatsoever, whether of content or layout, on stories or commentary originated by the [the newspaper], its columnists, or its contributors [is] prohibited." See also Herbert v. Lando, 568 F.2d 974, 978 (2nd Cir.) rev'd on the grounds 441 U.S. 153 (1977); Haines v. Knight-RidderCT Page 11866Broadcasting, Inc., 32 Fair Emp. Prac. Cas. (BNA) 1113, 1116 (DRI 1980). The station thus argues that any ruling of the court which requires the station to have Mr. Lark deliver the news constitutes an impermissible restriction. A news anchor, as indicated by the testimony, does more than simply deliver the news; he or she often writes the script and at times departs from the script or "adlibs" the report. A station must have the right to decide and control who writes and delivers the news. See, Sluys v.Gribetz, 842 F. Sup. 764, 769-70 (S.D. N.Y. 1994); Hunterv. Gaylord Broadcasting, 12 Media L. Rep. (BBA) 1591, 1592 (La.Ct.App. 1985).
 III.
This court holds, for all of the above reasons, namely: (1) that the pay no play clause does not conflict with the time specific duty clause; (2) that even if there was a breach of contract the plaintiff has an adequate remedy at law; (3) that the utilization of equitable relief in a personal service contact is disfavored to the extent it would require the court to continue a hostile relationship; and (4) that requiring the station to have Mr. Lark deliver the news would constitute a violation of the station's editorial rights protected by thefirst amendment of the United States Constitution, that the application for injunctive relief, both preliminary and permanent, is denied.
Berger, J.